## Frank and others *v.* Denver & R. G. Ry. Co. and others.

*(Circuit Court, D. Colorado.* February 12, 1885.)

1. Railroad Mortgage—Lease—Rolling Stock.

A contract, whereby cars and locomotives are leased to a railroad company, that agrees to pay for every car and locomotive so delivered an annual rent, equivalent to one-sixth of the original cost thereof, for the period of ten years, at the end of which the cars and locomotives are to become the property of the railroad company, with a proviso that upon default in payment of the annual rent, or failure to observe any of the covenants of the lease, the rights of the railroad company shall be determined, and the property reclaimed by the lessors, is a mortgage, and not a lease.

2. Same—Failure to Comply with State Law—Gen. Laws Colo. 1877, p. 124
—Lien—Rights of Creditors.

Where such an instrument is not acknowleged and recorded as required by the law of the state where the rolling stock is situated, it will not establish a

lien on such property in favor of the mortgagee as against creditors of the railroad company proceeding by attachment and execution, or purchasers from the railway company in good faith.

3. SAME—LIENS—INTEREST ACQUIRED BY MORTGAGEE.

Mortgagees of property to be acquired by the mortgagor, take only the interest of the mortgagor therein, and if the property is already subject to mortgages or other liens, the general mortgage does not displace them, though they may be junior to it in point of time.

4. SAME—SELLER RETAINING LIEN.

This rule applies to the seller of property who retains a lien on the property sold, or the title thereto, as security for the purchase money.

5. SAME—RECEIVER—PAYMENT OF CLAIMS—ORDER MODIFIED.

Order directing receiver to pay principal and interest falling due under the contract, under which rolling stock was furnished to the railroad company, modified so as to postpone payment of principal until other claims are paid.

Upon Motion to Vacate or Modify the Order directing the receiver to pay car trusts.

*L. S. Dixon,* for plaintiffs.

*Hugh Butler, L. K. Bass,* and *C. J. Hughes,* for defendants.

*E. O. Wolcott,* for receiver.

HALLETT, J.    June 6, 1878, the Philadelphia Trust, Safe Deposit & Insurance Company entered into contract with the Denver & Rio Grande Railway Company "to lease to and place upon the railroad" of the latter company certain cars and locomotives which should be delivered to the first-named company for that purpose by the Philadelphia & Colorado Equipment Trust.    Defendant company was to pay "for every car and locomotive an annual rent equivalent to the one-sixth of the original cost thereof," and the lease to continue for 10 years, when the cars and locomotives would become the property of the railway company.    By this method of computation, it is said that upon completing the contract the railway company would pay the cost of the rolling stock, and 8 per cent. interest on deferred payments.    Under this agreement cars and locomotives of the value of $345,500 were delivered to the railway company, of which $217,000 has been paid, and interest and cost of trust amounting to $123,-396.20.

Other contracts of similar character, to the number of five, were afterwards made by the railway company with the Rio Grande Extension Company by which the railway company obtained rolling stock of the value of $4,970,000.    These agreements were assigned to the Guarantee Trust & Safe Deposit Company, of Philadelphia, a defendant in the bill and the present holder.    In all these instruments it was provided that, upon default in payment of the annual rent, or failure to observe any covenant of the lease, the right of the railway company in the rolling stock would be determined, and the property might be reclaimed by the lessor.    The same result would follow "any proceedings of law or in equity, or otherwise, in which the said party of the second part may be a party, whereby any of the rights, duties, and obligations of the party of the second part under this contract shall or may be transferred, abridged, or in any manner whatever al-

tered or impaired, or its control and custody of the leases, cars, and locomotives be in anywise interfered with; and any termination of this lease under this covenant shall have the same effect as if the party of the first part or its assigns had repossessed themselves of the said cars and locomotives, as hereinbefore provided."

These instruments, in the form of leases, and having somewhat of the aspect of conditional sales, were a disguise of the real transaction between the parties. The rolling stock was not, at any time, owned or held by the parties assuming to lease the same, or by any one represented by such parties. Under the first contract of June 6, 1878, the Philadelphia & Colorado Equipment Trust, an association of shareholders, to the amount of $500 each, furnished money, with which the railway company either bought or constructed cars and locomotives for its own use. In like manner, under the other contracts with the Rio Grande Extension Company, the railway company bought or constructed rolling stock for its own use with money furnished by shareholders through the Guarantee Trust & Safe Deposit Company, to be returned, with interest, from the payments made under the contracts by the railway company. Thus it appears that the payees of these instruments cannot stand in the character assumed by them, of lessors of the rolling stock, and, in so far as they may have any position in the law, they are to be regarded as mortgagees of the property. This assumption of a false character by the payees, with much verbiage of the law in the several contracts, will not, however, affect the result, if the equities of the transaction shall appear to be with them, of which more will be said further on.

In July last, when the original bill was filed, and the receiver was appointed, plaintiffs had not discovered any defect in the contracts, and were disposed to recognize them as valid and binding, and requiring fulfillment on the part of the railway company, in order to retain the interest already acquired through and by means of the large payments previously made under the contracts by the railway company. Accordingly, they asked that the receiver appointed in the cause be directed to pay the sums falling due under the contracts for principal and interest; and this was done. The receiver has since paid, from the current earnings of the road, all such sums; and the plaintiffs, having amended their bill, now move to vacate or modify the order in that respect, on the ground that the rolling stock is subject to the consolidated mortgage which they seek to foreclose, and the said several contracts are invalid as against them. The consolidated mortgage, under which plaintiffs claim, bears date January 1, 1880, and covers "the rolling stock and equipment, of whatever nature and kind, owned, or hereafter to be acquired and owned, and as acquired by the said company, subject to a first mortgage of the company, of date April 13, 1871. The first of the contracts, relating to rolling stock, was prior to the consolidated mortgage, but, as the property thereby acquired is subject to the first mortgage of the road,

and the lien of that mortgage was complete before the consolidated mortgage was executed, it will not be necessary to consider the relation of the latter mortgage to that property. In any view of the question presented, the plaintiffs cannot resort to the rolling stock acquired under the first contract until the first mortgage shall be satisfied, a contingency which does not call for discussion at this time. The other contracts were subsequent in date to the consolidated mortgage, and the property therein mentioned falls within the designation, in that mortgage, of after-acquired property. The provisions of the statute of this state, relating to chattel mortgages, (Gen. Laws 1877, p. 122,) were not observed in form and substance, in the manner of acknowledging or recording these instruments, and therefore they do not establish a lien on the property in favor of the defendants, as against creditors of the railway company proceeding by attachment and execution, or purchasers from the railway company in good faith. *Hervey* v. *Rhode Island Locomotive Works*, 93 U. S. 664; *George* v. *Tufts*, 5 Colo. 162.

And this is the pith and substance of plaintiffs' argument: that these rolling-stock contracts, being invalid as to creditors of the railway company, and purchasers from the railway company without notice, are also invalid as to them. But the rule is that mortgagees of property to be acquired by the mortgagor take only the interest of the mortgagor therein. As declared in *U. S.* v. *New Orleans R. R.* 12 Wall. 365, "a mortgage intended to cover after-acquired property can only attach itself to such property in the condition in which it comes into the mortgagor's hands. If that property is already subject to mortgages or other liens, the general mortgage does not displace them, though they may be junior to it in point of time. It only attaches to such interest as the mortgagor acquires; and if he purchase property and give a mortgage for the purchase money, the deed which he receives and the mortgage which he gives are regarded as one transaction, and no general lien impending over him, whether in the shape of a general mortgage or judgment or recognizance, can displace such mortgage for purchase money." *Fosdick* v. *Schall*, 99 U. S. 235.

This is certainly the rule established by these cases, in favor of the seller of property, who may retain a lien on the property sold, or the title thereto, as security for the purchase money; and the holders of these contracts would seem to be equitably entitled to the benefit of it. Having furnished money with which the railway company purchased rolling stock under an agreement for a lien on the property as security for repayment, they may stand in the place of the seller, and have advantage of all remedies to which he would be entitled in the same situation. In another view, and independently of any special contract establishing a lien on the property sold to the railway company, demands of this kind are debts of the income, to be paid from current revenues of the road in preference to bondholders

and other secured creditors. *Hale* v. *Frost*, 99 U. S. 389; *Burnham* v. *Bowen*, 111 U. S. 776; S. C. 4 Sup. Ct. Rep. 675.

If the road had not been supplied with rolling stock when the receiver took possession, it would have been necessary to purchase enough to carry on the business of the road, and the receiver would have paid for it from current earnings available for that purpose. That he now pays for the rolling stock under contracts made by the railway company previous to his appointment, does not present the question in any other light. He is buying rolling stock for the use of the road, and which is said to be necessary to carry on its business, according to the usual course of proceeding in cases of this kind. In order to keep the road in operation, the receiver must have rolling stock, and he ought not to take it in behalf of bondholders or any one, without paying for it. Every payment made under these contracts increases the interest of the railway company in the rolling stock, and adds to the value of plaintiffs' mortgage security. Payments are made in the interest of bondholders as well as the railway company, and I see no grounds for the complaint for them, unless it may be that the price of the cars is too high, or that some of them are not necessary to the business of the road. If anything is to be gained by rescinding any of the contracts and surrendering the cars to the payees, action may be had on proper showing, but the court is not now advised in respect to that matter. In some cases, where rolling stock was held under contracts of purchase, the receiver has paid for the use of it and returned it to the seller at the close of the receivership. *Fosdick* v. *Schall*, 99 U. S. 235; *Myer* v. *Car Co.* 102 U. S. 1.

That course was probably regarded as promoting the best interests of all concerned. Whenever considerable payments have been made under the contracts, and the interest of the railway company in the rolling stock acquired by such payments appears to be large, the advantage of continuing the payments under the receivership will be apparent. In that way the use of the property, during the receivership, will be secured, and the interest acquired by prior payments may become available to the company or to purchasers on foreclosure. My conclusion is, therefore, that, until some further showing shall be made in these matters, payments under these contracts ought to be continued by the receiver in the interest of all parties concerned. There is, however, some reason to believe that these rolling-stock creditors have, at present, under the order heretofore entered, an extraordinary preference over other claims of the same class, to which they are not entitled. While as to the bondholders of the railway company, secured by general mortgage of the road and its property, they stand with the labor and supply creditors, and are entitled to payment from the current income of the road, I perceive no reason for saying that they are above all other creditors of the class to which they belong. The circumstance that they exacted of the railway company a stipulation to deliver the property to them in case of non-

payment will hardly accomplish that result. Creditors of an insolvent estate in the hands of a receiver are entitled to payment in the order and precedence established by the merits of their claims, and not by legal remedies, for which they may have contracted, or which may be given them by law. It is disclosed that payments made by the receiver under these contracts have so absorbed the earnings of the road that the orders of the court relating to labor and supply demands remain in large part unexecuted. While, as before stated, these rolling-stock people, in a general way, and with reference to the general mortgages of the road, are classed with the labor and supply creditors, the latter are more immediately and directly creditors of the income. They wrought and gave of their substance under promises of prompt payment from the railway company, and the rolling-stock people are, as to them, general mortgagees of a part of the company's property,—long-time creditors, reaping interest as the others may sow for them.

The labor and supply creditors, who are entitled to payment under existing orders in any just consideration of their position, seem to be on an equal footing if not in advance of the rolling-stock contracts, and they have been postponed for the benefit of the latter for more than seven months. They are now entitled to payment of their demands. The large amount of taxes falling due at this season of the year adds to the financial difficulties of the situation. As the rolling-stock people have hitherto received their dues promptly, while others, equally entitled to payment, have been compelled to wait, it seems reasonable to suspend payment of principal sums falling due under their contracts until other demands on the receiver have been satisfied. With the payment of interest as it matures, which, it is believed, can be made without serious embarrassment, no injustice will be done to these creditors, and the receiver will have funds to relieve other creditors of the company, and to pay taxes. The order directing payment of amounts coming due for rolling stock will be modified, as indicated, so as to postpone the payment of principal sums until other demands, recognized in existing orders, shall be paid.