CENTRAL TRUST Co. v. OHIO CENT. R. Co. et al. (McGOURKEY, Intervenor.)

(Circuit Court, N. D. Ohio, W. D.    August 29, 1888.)

RAILROAD COMPANIES — BONDS AND MORTGAGES — PRIORITY — CAR TRUSTS — LEASES.

A contract was entered into between the trustee of an alleged car trust and a railroad company, whereby cars and locomotives were leased by the former to the latter, it agreeing to pay for every car and locomotive delivered an annual rent for the period of 10 years, at the end of which they were to become the property of the railroad company; the several payments of rental to be evidenced by obligations of the railroad company due at the time of the maturing of said payments, and delivered *pro rata* to the lessor at the time of the delivery of said rolling stock, with coupons for the payment of interest. The evidence showed that the trustee at the time of the execution of the lease neither owned nor possessed the rolling stock purported to be leased; that after the execution of the lease the railroad company furnished to the agent of said trustee the names of subscribers; that thereupon such agent made out subscription certificates, which were signed by said trustee as cashier, certifying that the holders would be entitled to so many thousand dollars of car-trust certificates when the subscription was paid in full. The money paid in on said subscription certificates was credited thereon and deposited in bank to the credit of the "equipment account" of the railroad company. When the installments were all paid on the subscription certificates, the railroad company scheduled the rolling stock under the said lease, and the trustee certified the car-trust certificates and turned them over to the holders thereof *pro rata*, or in full of their subscription if paid up. The railroad company obtained the rolling stock under its own contracts with the car builders. *Held*, that the car-trust certificates were, in legal effect, mortgage bonds, and as such inferior in point of lien upon such rolling stock, to a prior mortgage with an "after-acquired property" clause.

In Equity. On exception to report of the special master upon the intervening petitions of George J. McGourkey, trustee of car trusts:

*Geo. Hoadly* and *James Irvine*, for petitioner, McGourkey.

*Stevenson Burke* and *Doyle & Scott*, for the Central Trust Company and the Ohio Central Railway Company.

JACKSON, J. The original or main suit herein was brought by complainant to foreclose certain mortgages executed by the Ohio Central Railway Company, January 1, 1880, to secure $3,000,000 of first mortgage bonds and $3,000,000 of income bonds. The mortgage or trust deed securing the first mortgage bonds conveyed to said Central Trust Company of New York, as trustee, in very broad and comprehensive terms, all the line of railroad of the mortgagor, with all rights of way, road-bed made and to be made, track laid and to be laid between the designated terminal points, including all the stations, depot grounds, fences, rails, bridges, sidings, engine-houses, machine-shops, buildings in any way then or thereafter appertaining unto said described line of railroad, "together with all the engines, cars, machinery, supplies, tools, and fixtures now or at any time hereafter held, owned, or acquired by said party of the first part for use in connection with its line of railroad aforesaid." This mortgage, as well as the income mortgage securing the $3,000,000

of income bonds, was duly recorded.   The railroad company made default in paying the interest on said bonds, and the said trustee thereafter, in pursuance of and in conformity with the terms and provisions of said mortgages, commenced proceedings in this court to foreclose said mortgages by a sale of the property covered thereby.   Such proceedings were had in the cause as resulted in a sale of the franchises and property of the said Ohio Central Railway Company in the summer of 1885, when, under a scheme of reorganization participated in by a large majority of the bondholders and a considerable portion of the stockholders, said property and franchises were purchased for this account, and then conveyed to a newly-organized corporation, called the "Toledo & Ohio Central Railway Company," which thus became the successor of the said Ohio Central Railway Company in and to franchises and property of the latter covered by said mortgages.   At or about the time of commencing said foreclosure suit, John E. Martin was, on September 30, 1883, appointed receiver of the road and property of said Ohio Central Railway Company, and said receivership continued for the period of 21 months, extending from October 1 1883, to June 30, 1885.   The regularity of these proceedings, not being called in question or in anywise involved in the present controversy, need not be noticed with more particularity or detail.

On April 2, 1884, during the pendency of said foreclosure suit, George J. McGourkey, trustee, filed his two intervening petitions in the cause, alleging that under three certain lease contracts entered into and executed between himself and said Ohio Central Railway Company, bearing date, respectively, August 20, 1880, March 1, 1881, and March 1, 1882, he had leased and delivered to said railway company 27 locomotives, 3,300 coal cars, and 340 box cars, designated and identified by serial numbers mentioned, and the letters "O. C. C. T." marked thereon, for which the railway company had agreed to pay him certain rentals during the period stated in each lease, when said locomotives and cars were to become the property of said railway company.   The petitions, after setting out the terms of said lease contracts, and the payments that had been made thereunder, both by the company and the receiver, alleged that said cars and locomotives had gone into the possession of said receiver, and were then being used by him in conducting the business of said railroad, and prayed that said receiver be directed by the court either to perform the covenants of said leases by paying the balance due petitioner thereunder, or that he be directed to deliver up said equipment, and pay petitioner for the use thereof; and asking for a reference to a special examiner to ascertain and report the value of such use.   On the 18th of June, 1887, said McGourkey, trustee, filed a third petition in the suit, claiming that there was due him as rental under said leases from March 1, 1883, to October 1, 1883, when said equipment went into the hands of the receiver, the sum of $124,000, which, though accruing before the receivership, should be paid him, because cash assets, personal property, and earnings to a large amount had come into the possession of the receiver, and been applied towards permanent improvements, new equipment, and

betterments placed upon the property, etc. The Central Trust Company, complainant in the foreclosure suit, and the Toledo and Ohio Central Railway Company, as the purchaser of the mortgaged property sold there-under, answered said petitions, denying the title of McGourkey, trustee, to the equipment claimed by him, and disputing his right to any rental for the use of the same while in the hands of the receiver. A reference was directed to a special master, who took proof, and reported that the petitioner, McGourkey, trustee, should be paid about the sum of $80,-000 as rental while said equipment was used by the receiver between October 1, 1883, and June 30, 1885, in addition to what had been paid during said period, which amounted to about $129,600. The petitioner and the complainant, together with the Toledo & Ohio Central Railway Company, each filed exceptions to said report; the petitioner claiming that he has a valid title to said equipment, and is entitled to a much larger rental therefor; and the complainant, in behalf of the first mortgage bondholders, and the Toledo & Ohio Central Railway Company in its own behalf, insisting that the title to said cars and locomotives was vested in said Central Trust Company, under and by virtue of the "after-acquired property" clause of the mortgage of January 1, 1880, executed to secure the railway company's first mortgage bonds. That said McGourkey, trustee, under and by virtue of said leases acquired nothing more than a lien upon said equipment, subject to the prior lien and title of said mortgage, and that he is not entitled to any rent or purchase money therefor as against said bondholders or their trustee; but, if mistaken in this view of their rights, that the surplus earnings derived from the receivership, and now in court, amounts to only about $80,000, and that petitioner should in no event be awarded a greater allowance than such surplus earnings, as any greater allowance would have to be paid out of funds or property belonging to and purchased by the bondholders under the foreclosure suit. It is conceded by counsel for petitioner, McGourkey, (and, as the court thinks, properly so,) that complainant and the Toledo & Ohio Central Railway Company are not estopped by anything that has occurred during the progress of the foreclosure suit from setting up the claims they insist upon in respect to said equipment.

But counsel for complainant and the Toledo & Ohio Central Railway Company have gone further, and contended that the leases, under which petitioner asserts his claim to said equipment and to compensation for the use thereof while in the possession of the receiver, were a part and parcel of a fraudulent scheme contrived and put in operation by the pool or syndicate which originally organized the Ohio Central Railway Company. It appears that, in 1879, what is called the "$3,000,000 pool" was formed to acquire and complete certain lines of railroad, which were to constitute the Ohio Central Railway Company. This syndicate, through its committee, composed of George I. Seney, Dan P. Eells and George F. Stone, representing the subscribers to said pool, contracted with Brown, Howard & Co., also members of said syndicate, to acquire and construct the lines that were to form said Ohio Central Railway Company; to organize

said company with a capital stock of $5,000,000, and, when completed and organized, the company's capital stock of $5,000,000, together with its first mortgage bonds for $3,000,000, and its income bonds for $3,000,000, were to be issued. This stock and these bonds, aggregating $11,000,000, were to be turned over by Brown, Howard & Co. to the subscribers to said pool or syndicate, which was to and did pay to Brown, Howard & Co. the $3,000,000 for acquiring, completing its lines, and organizing said railway company. Brown, Howard & Co. were also to furnish the road with $560,000 worth of equipment. They completed and organized the company under this contract, received from the syndicate the $3,000,000, and turned over to the pool the $11,000,000 of stock and bonds of the company, which were distributed between members of the syndicate in proportion to their respective subscriptions to the $3,000,000 pool; the result of the transaction being that the promoters of the enterprise obtained $11,000,000 of the railway company's securities at and for an actual outlay of only $3,000,000. The securities so received were at the date of issuance, or very soon thereafter, worth in the market largely more by several millions than the sum of $3,000,000 paid out therefor. Following this transaction, and as a part of the same alleged fraudulent scheme, it is claimed that said syndicate having control of the railway company adopted and carried into execution a fraudulent plan and contrivance to make a third issue of bonds secured by mortgage upon the terminal property and facilities of the company at Toledo, and then take said terminal properties out of the operation of the first mortgage made to secure the first mortgage bonds. The report made by the officers of the company under the laws of Ohio, it is claimed, made an entirely different showing from that stated above, and showed ample assets in the company's hands to provide it with all necessary and reasonable equipment, but that, notwithstanding this, the same management, and largely the same individuals, contrived this further fraudulent scheme of making car-trust securities under a guise of leases for the purpose of further defrauding the public and securing still larger profits and advantages to themselves. While the transaction connected with the organization of the company under which the promoters of the enterprise obtained for themselves $11,000,000 of the company's securities, and while the further transaction in connection with the "terminal mortgage," as it is called, are both open to grave suspicion as to their good faith, and subject to severe criticism, it is not perceived how they can affect the question now under consideration. The pool may have been overpaid, but how does this inure to the benefit of complainant or of the Toledo & Ohio Central Railway Company? The terminal properties at Toledo may by a fraudulent contrivance have been taken out of the operation of the first mortgage, but how can complainant or the Toledo & Ohio Central Railway Company, in this proceeding, either have that wrong corrected, or obtain any benefit therefrom? It may be true that the same parties who carried into execution said alleged fraudulent transactions are the same parties who originated the alleged fraudulent con-

trivance to raise money by means of the present car-trust leases, but the holders of the company's certificates or obligations issued under said leases are or may be entirely different persons, whose rights could hardly be affected (if their securities are negotiable, and were acquired for value before maturity and without notice) by the fraudulent conduct of the contrivers and originators of the scheme. The court does not see that the transactions connected with the organization of the railway company under which the promoters obtained the $11,000,000 of its securities can be gone into, or has any direct bearing upon the present controversy. Nor is it perceived what effect can be given to the question discussed as to the validity or invalidity of the terminal mortgage in considering and determining the rights of the respective parties in and to the equipment and the rental thereof here involved. These prior transactions will therefore be left out of further consideration and discussion.

We are then brought to the important and controlling question in the case, viz., who has the superior right to or lien upon the equipment in controversy,—the petitioner, under the lease contracts, or those represented by complainant and the Toledo & Ohio Central Railway Company, under the mortgage of January 1, 1880? The first car-trust lease was executed August 20, 1880, and reads as follows:

### LEASE A.

"Memorandum of agreement made this 20th day of August, A. D. 1880, between Geo. J. McGourkey, trustee, and the Ohio Central Railroad Company, whereby George J. McGourkey, trustee, agrees to lease to the Ohio Central Railroad Company, and the Ohio Central Railroad Company agrees to hire from him, eight hundred coal cars and fourteen locomotives, bearing the numbers, and to be made by the makers set out in the schedule hereto attached and made a part thereof, marked 'Schedule A,' and delivered at Columbus, Ohio, in accordance to specifications hereto annexed, such renting and hiring to be in respect of each of said cars and locomotives for the period of ten years from the date of the delivery of said cars to said railroad company, but subject, however, to the provisions and conditions hereinafter contained. The said rolling stock to be delivered as per the contract of said George J. McGourkey, trustee, with the said makers, but it is understood that the said George J. McGourkey shall in no way be liable for any delay that may arise in delivery of said cars by said makers, and said railroad company may for convenience make the contracts direct with said makers. The rental of said cars and locomotives payable to George J. McGourky, trustee, lessor or assigns, by the Ohio Central Railroad Co., lessee, shall be as follows: The gross sum of one hundred thousand dollars on delivery of said cars and locomotives, and ratably in that proportion, counting twenty cars as equal to one locomotive in and for the delivery of any portion thereof to the persons authorized by the said railroad company to receipt for the same, and the receipt of such persons or person shall be final and conclusive evidence of the acceptance of such locomotives and cars to the satisfaction of the lessees, and in addition the full sum of forty thousand dollars ($40,000.00) in each year from the date of this agreement of lease for the term of ten (10) years, together with interest on such yearly payments at the rate of eight (8) per cent. per annum, payable semi-annually on the 1st days of March and September of each year during said term. In case of default in the payment of any installment or installments of rent on the day on which the same falls due here-

under, the said lessor or assigns shall have the right at their option to enter upon the premises of the railroad company to remove any and all locomotives and cars which shall have been delivered to said railroad company under this agreement and have the right to sell the same at public or private sale, and the proceeds to be applied to the payment of any and all installments of rent for said cars and locomotives for the whole of said term of ten (10) years limited and prescribed by this agreement, whether said installments shall have then fallen due or not, and notwithstanding said locomotives and cars shall have been taken possession of and removed and sold prior to the expiration of this lease; and if the proceeds shall be more than are sufficient to pay such unpaid installment of rent with interest and expenses, then the surplus to be paid to the Ohio Central Railroad Co., but if there should be any deficit the Ohio Central Railroad Company shall be liable to pay such deficit on demand. The lessees to keep said cars and locomotives in proper and complete repair and condition, less the fair wear and tear, and such repair and maintenance to be done to the satisfaction of the agent or engineer of the lessor. That at all times the name, number, and plate, or other marks and signs of ownership of the lessor, to-wit, 'Ohio Central Car Trust,' or the initial, to-wit, ' O. C. C. T.,' shall be fixed and retained upon each of the cars and locomotives aforesaid for the purpose of making the ownership publicly known, and, in the event of any such marks or signs being destroyed, the lessee will immediately restore the same; and that such other things shall be done as by the counsel of said lessor shall be deemed necessary or expedient for the full and complete protection of the rights of said lessor as owner of said cars. That said cars and locomotives are to be insured against fire to the amount ——— dollars, ($———,) and the insurance is to be paid by the lessee, loss, if any, made payable to George J. McGourkey, trustee, as his interest may appear. The lessee shall replace any cars and locomotives lost by fire, and in that case it shall receive from the lessor the amount collected from the insurance company or companies on such loss. The several payments to be paid for rental to be evidenced by obligations of the lessee due at the time of maturing of said payments, as defined by this lease, and delivered *pro rata* to said lessor at the time of the delivery of said rolling stock, with coupons for the interest payment hereinbefore provided for.

"And the Ohio Central Railroad Company covenants and agrees to perform the agreements and undertakings in its behalf contained herein, and to pay promptly each and every obligation so to be given thereunder; and it is further agreed that in consideration of such several hereinbefore specified payments during the said term of ten (10) years, and all other sums of money due hereunder, and interest which may have accrued thereon, being fully paid to the lessor, and in consideration of ten (10) cents for each and every of said cars and of one (1) dollar for each and every locomotive being also paid by the lessee within thirty (30) days after the expiration of said term of ten (10) years, that then the said rolling stock, as described herein, shall become and be the absolute property of said lessee, without further conveyance or transfer. The said lessee agrees to pay the lessor or assigns not to exceed one hundred dollars per annum for the expense of an agent or engineer to examine the said cars. The lessee agrees to pay the expense of preparing the obligations to be given for the rental.

"In witness whereof, the said parties hereto have hereunto set their hands and seals this 20th day of August, A. D. 1880.

"GEO. J. McGOURKEY.                    [Seal.]

"THE OHIO CENTRAL RAILROAD COMPANY,

[L. S.]                    "By SAMUEL THOMAS, Vice-President.

"B. G. MITCHELL, Secretary,"

The lease contracts of March 1, 1881, and March 1, 1882, called, respectively, "Lease B, No. 1," and "Lease B, No. 2," were in substantially the same form, and contained substantially the same provisions, differing only as to the number of cars, amount of rental, and time of payment. They need not be set out in full. What is said in reference to Lease A will apply in all respects to each of them. Neither of said agreements were ever recorded. No schedule or schedules, as referred to therein, were attached to the instruments at the time or times of their respective execution and delivery. When Lease A was executed and delivered, neither McGourkey, trustee and lessor, nor the beneficiaries thereunder, if any such existed, either owned or possessed any cars and locomotives, as therein described and purported to be leased. Neither had he or his *cestui que trust* any existing contracts or arrangements with others for the making, building, or furnishing such cars or locomotives, either to said trustee or to the railway company. The transaction, as detailed by the trustee, McGourkey, and B. G. Mitchell, secretary of the Ohio Central Railway Company, who acted as the agent of said McGourkey in carrying out the plan, was in brief this:

After the execution of the lease certain officers of the railway company (Messrs. Eells, Brice, and Seney) would furnish to said Mitchell the names of the subscribers to the fund. Mitchell would thereupon make out a subscription certificate, which was signed by the Metropolitan National Bank of New York, as fiscal agent, or by McGourkey, cashier, certifying that the holders would be entitled to so many thousand dollars of the car-trust certificates, when the subscription was paid in full. The money paid in on said subscription certificates was credited thereon, and was deposited by said Mitchell in the Metropolitan National Bank to the credit of an account called the "Equipment Account of the Ohio Central Railroad." When the installments were all paid on these subscription certificates, and the general manager of the railway company furnished the trustee with a schedule of the number and marks of the equipment which the company had in its possession, and which it intended should be covered by and included in said lease, the trustee would certify the company's car-trust certificates or obligations, which said Mitchell would turn over to the holders of subscription certificates *pro rata*, or in full of their subscription, if then paid up. By the terms of the lease "the several payments to be paid for rental to be evidenced by obligations of the lessee due at the time of maturing of said payments, as defined by this lease, and delivered" *pro rata* "to said lessor at the time of the delivery of said rolling stock, with coupons for the interest payments hereinbefore provided for." These car-trust certificates or obligations of the company so issued after it had obtained rolling stock under its own contracts and arrangements with car builders or constructed by itself, were, in legal effect and operation, mortgage bonds, with coupons for interest attached. The fund thus deposited in the Metropolitan National Bank to the credit of the "equipment account of the Ohio Central Railroad," was from time to time placed within the reach and control of D.

P. Eells, the president of the railway company, in the following manner: Said Eells was president of the Commercial National Bank of Cleveland, Ohio, where he resided. Mitchell, the secretary of the railway company, was a clerk in the Metropolitan National Bank, and attended to all the details of the business for McGourkey, trustee, who was also cashier of said Metropolitan Bank. When Eells needed said funds for use of the railway company, Mitchell would transfer the same to the credit of the Commercial National Bank of Cleveland, and charge said "equipment account of the Ohio Central Railroad." Then the Commercial National Bank would credit the amount to the Ohio Central Railway Co., which kept a general account with said Commercial Bank. Said account of the railway company in said Commercial National Bank was made up of discounts made for it by said bank and of amounts so transferred to its credit from the "equipment account" fund. In what proportion the amounts standing to the credit of the railway company in the Commercial National Bank from time to time were made up of such transfers of credit, and of discounts made directly to or for the company, does not appear from anything disclosed in the evidence. Much of the equipment in controversy, after the same was received by the company under contracts between itself and the car builders, were paid for out of those funds and deposits standing in the Commercial National Bank of Cleveland to the credit of the Ohio Central Railway Company; the checks or drafts on which such payments were made, rarely, if in any instance, indicating that the payment was made for or on account of the car trust or of McGourkey, trustee. The account standing in the Commercial National Bank of Cleveland to the credit of the railway company was also checked or drawn upon from time to time for the general purposes of the company other than in the purchase or payment for equipment. The evidence does not disclose the existence of any organized car-trust company or association for whom McGourkey was to act as trustee, and who was engaged in the business of buying or constructing cars to be leased or sold conditionally to railroad companies. The so-called "car trust association" were merely the subscribers who agreed to take and pay for bonds with interest coupons attached, to be issued by the railway company, and be secured by mortgage upon certain described rolling stock which the company expected and intended to construct or acquire by purchase, and which it was to designate after being acquired by including it in a schedule to be furnished the trustee. Until such schedule was made by the railway company and furnished to the trustee to be attached to the so-called "lease," that instrument was wholly incomplete and inoperative. Lease "A" recites that the Ohio Central Railway Company "agrees to hire from him [McGourkey] 800 coal cars and 14 locomotives, having the numbers and to be made by the makers set out in the schedule hereto attached and made a part hereof, marked 'Schedule A,' and delivered at Columbus, Ohio, in accordance to specifications hereto annexed," etc. No schedule was attached when said instrument was executed and delivered. No specifications were thereto annexed; nor

does it appear that any cars were ever delivered at the place designated. On the 23d of February, 1881, six months after the execution of Lease A, Hadley, the general manager of the railroad company at Toledo, Ohio, appears to have furnished the trustee with the following statement:

"SCHEDULE A.

"Description of locomotives and coal cars owned by Ohio Central Car Trust. Co., and leased by G. J. McGourkey, trustee and lessor, to the Ohio Central Railroad Company.

"14 locomotives marked 'Ohio Central C. T.' Numbered 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30. 800 coal cars marked 'Ohio Central C. T.,' numbered, viz.:

| From | 100 to 300, inclusive, | - | - | - | - | 201 cars. |
|---|---|---|---|---|---|---|
| " | 758 to 800, " | - | - | - | - | 43 " |
| " | 1,044 to 1,405, " | - | - | - | - | 362 " |
| " | 1,406 to 1,599, " | - | - | - | - | 194 " |
| | Total, - - - - - | | | | | 800 |

"Received the above-described locomotives and cars.

"G. G. HADLEY,
"General Manager, O. C. R. R. Co.

"*Toledo, O., February* 23, 1881."

—Which was thereafter attached to said lease agreement of August 20, 1880. The 14 locomotives referred to in said schedule, except Nos. 29 and 30, were received and went into the service of the company between December 20, 1880, and February 5, 1881. Nos. 29 and 30 were not received by the company till March 3, 1881. It appears from the evidence that these locomotives were purchased or received by the railway company from the Brooks Locomotive Works of Dunkirk, N. Y., under contracts entered into in July, 1880, prior to the execution of Lease A. By the terms of these contracts between the railway company and the locomotive works four locomotives were to be delivered in July, 1880, three in September, 1880, five in December, 1880, and five in January, 1881. While the contract was being executed, and after a portion of the engines had been delivered, G. G. Hadley, the general manager of the Ohio Central Railroad Company, under date of September 29, 1880, wrote the contractors as follows: "We desire to place upon 14 of our new locomotives, now under construction by you, the following: 'Ohio Central C. T.' This should be upon a small plate, placed so as to be removed easily." There is no evidence to show that said 14 engines so marked, and subsequently included in said Schedule A, were paid for out of the fund paid into the Metropolitan National Bank by the subscribers to the car-trust certificates, which by the terms of the lease were not to be issued by the company till after said schedule was attached to the lease, or until after the locomotives were received and in possession of the company. But it does appear from defendant's Exhibit No. 79, that said locomotives numbered from 17 to 28, inclusive, were paid for by the Ohio Central Railroad Company by drafts of Hadley, its gen-

eral manager, upon H. P. Eells, the assistant treasurer of the railroad. There is no evidence as to how the 606 coal cars embracing the Nos. 100 to 300, inclusive, 758 to 800, inclusive, and 1,044 to 1,405, inclusive, were acquired, or when paid for, or out of what fund. These 606 cars were mostly received by the railroad company during the fall of 1880. As to the remaining 194 coal cars, embracing Nos. 1406 to 1599, inclusive, the contract for their construction was made by and in the name of the Ohio Central Railroad Company with the Peninsular Car Works of Detroit. By the terms of the contract, which bore date September 1, 1880, said cars were to be delivered, not at Columbus as provided in the lease, but at Toledo, Ohio, and were to be paid for by the railroad company at the price of $410 for each car in cash, on the delivery of each lot of 25 cars. They were, in compliance with the contract, so delivered to and received by the railroad company between October 1, 1880, and December 16, 1880. These 194 coal cars were paid for by the Ohio Central Railroad Company; the drafts therefor being drawn by Mr. Andrews, the assistant treasurer of the company at Toledo, where the cars were turned over to the company. Under date of September 6, 1880, Hadley, the general manager of the Ohio Central Railroad Company, instructed the contractor to mark said 194 coal cars "Ohio Central," in large letters, and on the end of the sill in small letters, "Ohio Central C. T." In contracting for, receiving, and paying for these cars and locomotives embraced in Schedule A, which was certified by the general manager of the road on the 23d of February, 1881, months after the cars went into the possession of the company, no agency relation was disclosed by the railroad company. On the contrary, the car builders dealt with it as the only real principal, and were paid by it in the ordinary and usual course of business, so far as the evidence goes.

We come next to what was done under Lease B, No. 1, which purported to lease to the railroad company 1,400 coal cars. This lease was a separate and distinct transaction from the first. It was executed March 1, 1881, to secure the payment of what is termed therein "trust-certificate obligations" of the company to the amount of $800,000, in 10 annual installments, with interest thereon, beginning with the 1st day of September, 1884. These annual payments are designated as the rental which the railroad company, as lessee, was to pay for the 1,400 cars, and, when paid, the title to the cars was to pass from the lessor to the so-called "lessee." The obligations sought to be secured in and by said lease were ordinary coupon bonds of the Ohio Central Railroad Company, which were "to be delivered to the said trustee" *pro rata* "at the time of the delivery of said coal cars." Neither the trustee nor the parties who should thereafter become the beneficiaries or *cestui que trust* under the lease, owned or possessed any cars, as therein described, at the time of entering into said lease agreement; nor was any schedule thereof attached to said lease at the date of its execution. On the 9th of December, 1881, nine months after the lease was executed, the following statement was made out by the general manager of the railroad company, and furnished the trustee, to be attached as Schedule A to said lease:

v.36F.no.9—34

*"Ohio Central Railroad Co. Office of the General Manager.*

"TOLEDO, O., Dec. 9, 1881.

STATEMENT A.

"Showing Ohio Central Cars covered by car trust.
"No. 2. Series B.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Nos. 1600 to 2599, inclusive, | - | - | - | - | - | 1,000 | cars. |
| " 2600 to 2799, " | - | - | • | - | - | 200 | " |
| " 4000 to 4049, " | - | - | - | - | - | 50 | " |
| " 4050 to 4199, " | - | - | - | | - | 150 | " |

Making a total of - - - - - - - 1,400 cars.

"The above-described Ohio Central Cars have all been received and are now in service. "G. G. HADLEY,

"Gen'l Manager, O. C. R. R. Co."

Now, what is the history of these cars? The 1,000 cars numbered 1,600 to 2,599, inclusive, were constructed by the Peninsular Car Works, of Detroit, under a contract made with and in the name of the Ohio Central Railroad Company, bearing date January 1, 1881. Under date of February 1, 1881, Mr. Hadley, the general manager of the Ohio Central Railroad, instructed the builders to number said cars 1,600 to 2,599, inclusive, and to letter them "Ohio Central" in large letters, and "Ohio Central C. T." in small letters, on sills. It thus appears that these 1,000 cars were not only contracted for by the railroad company, but were directed to be numbered and lettered as being embraced within a car trust which had not then been executed, or even created. The cars were then sought to be brought within the operation of Lease B, No. 1, a month before said lease had any existence. Many of these cars were actually received by the railroad company before the execution of said lease. They went into possession of the railroad company under said contract with the builders at different dates between the 26th of February, 1881, and the early fall of 1881. These cars were paid for by the Ohio Central Railroad Company, so far as the proof goes, partly in drafts drawn by the auditor of the company on H. P. Eells, its assistant treasurer, and partly by the note of the Ohio Central Railroad Company. It is not shown that any portion of the fund raised on the obligations of the railroad company attempted to be secured in and by said Lease B, No. 1, were applied in paying for said cars. We come next to the 250 cars numbered from 2,600 to 2,799, inclusive, and 4,000 to 4,049, inclusive, embraced in said schedule. These were built by the Michigan Car Company under contract with and in the name of the Ohio Central Railroad Company, entered into December, 1880. They were to be paid for on delivery of each 25 cars. They were delivered to and received by the railroad company between April 30 and August 30, 1881. Under date of February 1, 1881, Hadley, the general manager of the Ohio Central Railroad Company, wrote the Michigan Car Company as follows:

"GENTS: The new cars being constructed by you for this company will be numbered, viz.: 2,600 to 2,799, inclusive, 4,000 to 4,049 inclusive, lettered 'Ohio Central,' (as per sample car,) 'Ohio Central C. T.,' (in small letters on side sill.)"

Here again the contract for the cars and the lettering antedated the existence of the lease or contract under which they were afterwards, in December, 1881, attempted to be brought by the schedule which the general manager then made out. But how were these 250 cars paid for? It is clearly shown by Mr. Anderson, the treasurer of the Michigan Car Company, that they were paid for by the Ohio Central Railroad Company; the mode of payment being by drafts of said railroad company on its assistant treasurer. These drafts were sent to the builders by the assistant treasurer of the railroad company along with receipts or vouchers for the payments, which the builders would sign, and return to the offices of the railroad. The remaining 150 cars, numbered 4,050 to 4,199, were built by the Peninsular Car Company under contract with and in the name of the Ohio Central Railroad Company, said contract bearing date February 11, 1881, and were paid for by the said railroad company; the builders receiving payment from H. P. Eells, the assistant treasurer of the railroad, and from the Commercial National Bank of Cleveland on drafts of the company. No instructions appear to have been given as to numbering or lettering these 150 cars, which were received and went into the possession of the railroad company in November, 1881.

It is urged on behalf of petitioner that the railroad company in making said contracts for this equipment acted, under the provisions of said leases, as the agent of the trustee. It is true that D. P. Eells makes that statement in deposition in a general way, but it is manifestly incorrect or untrue, because the contracts were in almost every instance made in advance of the creation of the so-called "agency." They antedated the leases which undertook to make the railroad company act as agent for the trustee.

Let us next consider the transactions which were had under Lease B, No. 2, executed March 1, 1882, which purported to lease to the Ohio Central Railroad Company 2,500 coal cars, 340 box cars, and 13 locomotives. The petitioner claims that 1,100 coal cars, together with the 13 locomotives and 340 box cars, were delivered by him to the company under this agreement, which, like the other leases, undertook to designate the equipment leased by Schedule A, thereto attached. The so-called "rental" to be paid under this lease was $180,000 annually, beginning on the 1st of March, 1885, and running to the 1st of March, 1894, both inclusive. This rental, for reasons stated in the petition, appears to have been reduced at some time to $100,000 per annum. When this instrument was executed neither the trustee, McGourkey, nor the parties who might afterwards become the holders of the railroad company's obligations, therein described and intended to be secured, either owned or possessed the cars and locomotives which the trustee purported to lease; nor was any schedule of the cars attached to the instrument at the date of its execution, but at some subsequent period (the exact time does not appear) there was made out and forwarded to said trustee by some one the following statement:

*"Ohio Central Railroad Company.* (*Memorandum.*)

SCHEDULE A.

TOLEDO, O.,           , 188 .

Ohio Central Railroad Car Trust Assignment.
SERIES B.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 12 Locomotives, Nos. 31 to 42, inc. | | | | | | | | | |
| 1 " Bucyrus. | | | | | | | | | |
| Coal Cars, Nos. 1600 to 2599, inc. | - | - | - | - | - | - | - | - | - 1,000 |
| " " 2600 to 2799, " | - | - | - | - | - | - | - | - | 200 |
| " " 4000 to 4049, " | - | - | - | - | - | - | - | - | 50 |
| " " 4050 to 4199, " | - | - | - | - | - | - | - | - | 150 |
| " " 4200 to 5299, " | - | - | - | - | - | - | - | - | - 1,100 |
| Box Cars, " 3160 to 3499, " | - | - | - | - | - | - | - | - | 340 |
| Total, | - | - | - | - | - | - | - | - | 2,840" |

—Which petitioner exhibits with said Lease B, No. 2, and claims to be a part thereof and descriptive of the equipment covered thereby; 1,400 of the cars embraced therein being Nos. 1,600 to 2,799, inclusive, and 4,000 to 4,199, inclusive, were embraced in Lease B, No. 1, and have already been considered. What is the history of 1,100 coal cars, numbered 4,200 to 5,299, inclusive, embraced in said schedule? On the 22d of October, 1881, the Ohio Central Railroad Company contracted with the Peninsular Car Company to construct said cars, which were to be delivered to the company at Toledo, during the latter part of 1881 and first of 1882. On the 15th of November, 1881, Hadley, the general manager of the railroad company, instructed said car company to number said 1,100 cars 4, 200 to 5,299, inclusive. On the 25th of November, 1881, when the cars were being delivered and received, the Ohio Central Car Trust Association, "Series B," was substituted as the contractor for said cars in place of the Ohio Central Railroad Company, under the following agreement, viz.:

"This contract of Oct. 22, 1881, is by mutual consent this day modified in the following particulars:

"1st. The Ohio Central Railroad Company is released from the same, and the Ohio Central Car Trust Association, 'Series B,' is substituted as the party of the second part.

"2nd. The number of cars to be manufactured is reduced from eleven hundred and sixty to eleven hundred.

"3rd. Payment for cars is to be made at the option of the second party in cash on delivery in lots of one hundred cars each, or in the paper of the second party, indorsed by Geo. I. Seney and Dan. P. Eells, at sixty days from the date of delivery of cars in lots as above at Toledo.

"In case of paper being given, interest is to be allowed at the rate of six per cent. per annum.

"THE PENINSULAR CAR WORKS OF DETROIT.
"By FRANK J. HECKER, Vice Pres't and Man.
"THE OHIO CENTRAL RAILROAD CO.,
"By DAN. P. ELLIS, President.
"G. J. MCGOURKEY, Trustee.
"OHIO CENTRAL CAR TRUST, SERIES B.,
"By D. P. EELLS.

*"Cleveland, Nov.* 25, 1881."

The "Dan. P. Ellis" who signed said agreement for and in behalf of the Ohio Central Railroad Company is and was the same individual as "D. P. Eells," who executed it for the Ohio Central Car Trust Association, which was purely an ideal and imaginary concern so far as Lease B, No. 2, now under consideration, was concerned. That car trust under which these cars are now claimed was not then formed, and in respect to that there was no such Ohio Central Car Trust Association as that for which the said Eells undertook to agree with himself as president of the railroad company. This singular transaction occurring in advance of the execution of Lease B, No. 2, which formed, if formed at all, the car trust association, whose trustee now claims said cars under that lease, is open to much comment and unfavorable criticism. It presents itself in the questionable form of a preparation in advance to deal with property for which the company had contracted, and which was then being furnished it in some illegitimate or irregular way. Except 200 of said cars received in March, 1882, the entire number were received by the railroad company on and prior to February 9, 1882. How and by whom were they paid for? This does not clearly appear. Notes to the amount of $489,500 were given the car company for the cars as each 100 were received by the railroad company. Said notes, except one for $44,500, given March 10, 1882, at 63 days, all bore date, and many of them matured prior to, March 1, 1882. They were in the following form:

"$44,967.25.                                   TOLEDO, O., Dec. 6, 1881.

"Sixty days after date, the Ohio Central Railroad Car Trust Association, Series B, promises to pay to the order of Dan. P. Eells and Geo. I. Seney, forty-four thousand nine hundred and sixty-seven 25-100 dollars at the Metropolitan National Bank, New York.

"Value received.                                   Certified Feb. 7, 1882.

"METROPOLITAN NATIONAL BANK.

"Ohio Central Railroad Car Trust Ass.

"By G. G. HADLEY, Agent.

"No. ——— Due ———"

—But by whom paid or out of what fund does not appear. Such of said notes as matured and were paid prior to March 1, 1882, were not paid out of the funds realized on the company's obligations secured in and by said Lease B, No. 2. In respect to the 340 box cars included in Schedule A to Lease B, No. 2, it does not appear how or from whom they were acquired by the railroad company, nor how or out of what fund they were paid for. Many of them were received by and in the possession of the company before Lease B, No. 3, was executed. As to the 13 locomotives embraced in said schedule, the following facts appear: The locomotive called "Bucyrus" was an old engine that belonged to the Ohio Central Railroad Company. It was repaired in the company's shop, with the company's material, and by employes in the service and pay of the railroad, and was sold by the president of the company to said McGourkey, trustee. It had been repaired and returned to service prior to the execution of Lease B, No. 2. Four other locomotives included in

said schedule, being Nos. 39 to 42, inclusive, were built by the Ohio Central Railroad Company in its shops at Bucyrus, with its own material, and by its own labor; and after being completed and in the service of the company they were transferred to said car trust. The mode and method of doing this is shown in plaintiff's exhibit. The proceeds of the sale of these five engines, which were clearly the property of the company, were largely used by the president, Eells, in paying off a note of the railroad company, on which he was indorser. Locomotives numbered 31 to 35, inclusive, as shown by defendant's exhibit, were billed to Brown, Howard & Co., the contractors under the construction contract, who were bound to furnish $560,000 worth of equipment to the company, and were paid for by two checks and three ten-day drafts drawn by Hadley, the general manager of the railroad, on Watson H. Brown & Bro., of New York, bankers for Brown, Howard & Co. These locomotives were paid for on the 30th of December, 1881, and January 4, 1882, before car trust, Series B, No. 2, was executed or had any existence. The remaining locomotives, Nos. 36 to 38, inclusive, were billed to the Car Trust Association Ohio Central Railroad, under date of May 4 and 6, 1882, and appear to have been paid for by drafts of Brown, Howard & Co. on G. J. McGourkey, trustee Ohio Central Car Trust, at Metropolitan National Bank, New York; the date of payment being May 27, 1882.

Now, in the light of the foregoing facts relating to the equipment in controversy, and to the situation of the parties engaged in the transactions embodied in said lease contracts, what is the proper construction to be placed upon said instruments, and what is their true character? Are they what on their face they purport to be, "leases," by the trustee, or those represented by him, of equipment owned by him or them? Or are they merely mortgages of the Ohio Central Railroad Company, contrived and designed to cover rolling stock which it might subsequently acquire, and intended to secure to parties who would take its obligations called "Car-Trust Certificates," the repayment of the money advanced the company thereon? It is well settled that neither the name which the parties may give to an instrument, nor any particular provision, disconnected from all others, will determine the true character of the contract, but that the ruling intention of the parties, as gathered from the whole instrument, the situation of the subject-matter of the contract, and the circumstances surrounding the transaction, must be looked to in order to ascertain and determine its true character and meaning. Thus in *Heryford* v. *Davis,* 102 U. S. 235, a manufacturer of cars contracted to "loan" certain cars to a railroad company "for hire" at a stipulated price, payable in certain installments, for which the railroad company executed its notes, on the payment of which the car company was to "relinquish" the cars to the railroad company. It was also agreed that upon default on any of the notes the car company might, at its option, retake the cars and sell them, retaining for its own use all payments received up to that time, and keeping the amount unpaid out of the proceeds and returning the surplus, if any, to the railroad company. In construing this contract, Mr. Justice STRONG, speaking for the court, said:

"It is the legal effect of the whole which is to be sought for. The form of the instrument is of little account. Though the contract industriously and repeatedly spoke of loaning the cars to the railroad company for hire for four months, and delivering them for use for hire, it is manifest that no mere bailment for hire was intended. * * * It appears equally clear to us that the contract was not one for a conditional sale."

And after reciting the provisions of the contract the court proceed:

"In view of these provisions, we can come to no other conclusion than that it was the intention of the parties, manifested by the agreement, that the ownership of the cars should pass at once to the railroad company in consideration of their becoming debtor for the price. Notwithstanding the efforts to cover up the real nature of the contract, its substance was an hypothecation of the cars to secure a debt due to the vendors for the price of a sale."

In *Frank* v. *Railroad Co.*, 23 Fed. Rep. 123, HALLETT, J., in discussing a contract of similar character, said:

"These instruments in the form of leases, and having somewhat the aspect of conditional sales, were a disguise of the real transaction between the parties. The rolling stock was not at any time owned or held by the parties assuming to lease the same, or by any one represented by such parties. Under the first contract the 'Philadelphia & Colorado Equipment Trust,' an association of shareholders to the amount of $500 each, furnished money with which the railroad company either bought or constructed cars and locomotives for its own use. In like manner, under the contracts with the Rio Grande Extension Company, the railroad company bought or constructed rolling stock for its own use with money furnished by shareholders through the Guarantee Trust and Safe Deposit Company, to be returned with interest from the payments made under the contract by the railroad company. Thus it appears that the payees of these instruments cannot stand in the character assumed by them of lessors of the rolling stock, and, in so far as they may have any position in the law, they are to be regarded as mortgagees of the property."

In the present case the instruments under which the petitioner claims were clearly not contracts of bailment, contemplating merely the use of the equipment by the railroad company. The provisions of the contracts are wholly inconsistent with such a construction. Neither can the contracts be regarded as conditional sales of the rolling stock described therein, for the reason that such rolling stock was not at the time owned or held either by the trustee or those whom he might thereafter represent as the holders of the obligations issued by the railroad company and intended to be secured in and by said instruments. These obligations, called "Car-Trust Certificates," but in reality the coupon bonds of the Ohio Central Railroad Company, were not executed and delivered as evidence of the purchase-money price of the rolling stock, which the railroad company was buying from the lessor, who had no such rolling stock to sell, but they were the evidence of the company's indebtedness for money advanced for its use. It is true that the fund so advanced was to be used in the purchase, construction, or acquisition of equipment for the railroad company, and the obligations of the railroad company given for the repayment of the funds so furnished were to be secured by a lien on the rolling stock of the company. The payees or holders of these obligations, or their representative, McGourkey, trustee, cannot stand in the charac-

ter assumed by him, or them, of lessors of this rolling stock. The subscribers to the fund advanced to the company, and for which its obligations were issued, occupy simply the position of mortgagees, and the so-called "leases" constitute at best nothing more than a lien or security in the nature of a mortgage for the repayment of advances made the railroad company, and which its obligations given for the so-called "rental" were intended to repay. These mortgages made to secure the payment of its obligations, so incurred, covered and embraced, as we have already seen, rolling stock and locomotives to a large amount, which the company had previously contracted for, received and paid for, or constructed itself with its own material and labor. In respect to such rolling stock and engines thus previously contracted for by the company, and by it received and paid for, and also in respect to the five engines built at its own shops, with its own labor and material, and which after completion, as Eells, the president of the railroad company, states, were "conveyed" to the car-trust people, who paid for them after they were finished and in the possession of the railroad, it is clear that the complainant, the Central Trust Company, has the superior or paramount lien under the "after-acquired property' clause of the mortgage executed by the company January 1, 1880, to secure its first-mortgage bonds. In reaching this conclusion as to the true character and construction of said "leases," and of the relative rights of the trustee thereunder, and of the complainant under the "after-acquired property" clause of its mortgage, the court is not unmindful of, nor does it intend to disregard, the principle announced by the supreme court in *U. S.* v. *Railroad Co.*, 12 Wall. 362, that the rights of a party furnishing rolling stock to a railroad company, whether he retains the title thereto under a conditional sale or merely stipulates for a lien thereon for unpaid purchase money, are superior to those of a prior mortgagee claiming a lien upon or title to such rolling stock as "after-acquired property." It is not questioned that "a mortgage intended to cover after-acquired property can only attach itself to such property in the condition in which it comes into the mortgagor's hands." But as regards the bulk of the equipment in controversy, that principle does not avail or benefit the petitioner, for, as already shown, neither he nor those he represents had any title to or lien upon such portion of the rolling stock when the same came into the possession and control of the railroad company.

It is claimed for the petitioner that although the cars and locomotives in question were in most instances built for the railroad company under contracts made with the company and in its own name, and were first received by the company and paid for by its officers in the usual and ordinary course of business, the money so used in paying for the equipment came from the fund advanced by the subscribers for the car-trust certificates of the company, and that this use of the fund so raised created an equitable lien or resulting trust in or upon such rolling stock, which would be prior in right to the lien of complainant. Under the contracts for the construction of the equipment the cars were to be and were paid for on or after delivery to the railroad company. Now, so far

as the petitioner's rights depend upon the assertion of an equitable lien or resulting trust (if such a trust can be set up and enforced in respect to personal property) growing out of the alleged fact that the funds of his *cestui que trust* were used and applied in paying for this equipment, the burden of proof is upon the petitioner to show the particular car or cars and locomotives which were so paid for. He must trace his so-called "trust funds" into the identical cars and locomotives on which he asserts his equity or lien. This he has utterly failed to do, with the exception of the three engines Nos. 36, 37, and 38, in Schedule A to Lease B, No. 2. The evidence fails to show what particular cars and locomotives were paid for with the funds subscribed for the company's car-trust certificates, which were, in legal effect and operation, bonds of the company. But even if it had been or could be shown that funds raised as these were and placed to the credit of the "equipment account of the Ohio Central Railroad Company," and thence transferred to the credit of the company itself, were actually employed in paying for certain specific cars, it is still doubtful whether, in respect to such cars, the petitioner would thereby establish a right to a lien thereon superior to that of the complainant. The transactions involved in these so-called "leases" and the several car trusts formed thereunder, when analyzed, amount in substance and effect to nothing more than this: that money was loaned the company, for which it was to execute its bonds, which were to be secured by mortgage upon its rolling stock, such rolling stock to be selected and designated by itself at some future day, out of its general stock of equipment, and by its statement, called a "schedule," be attached to said mortgage. It was thus left to the officers of the company, many of whom, with its president, were interested in said car-trust certificates, to determine and indicate what cars and locomotives should come within the operation of these mortgages miscalled "leases." If a transaction of this character, and conducted as this business was, can be sustained, and held to confer superior rights to the lien of prior mortgages containing "after-acquired poperty" clauses sufficiently broad to cover the same property; then such "after-acquired property" clauses of mortgages will become idle and useless provisions, because by the easy contrivance of so-called "car trusts" and "car-trust certificates" of the mortgagor all subsequently-acquired property may be readily taken out of their operation. The present is readily distinguishable from that class of cases in which car companies, or manufacturers or other actual owners of cars, lease or conditionally sell, or sell absolutely, with lien retained for purchase money, certain equipment to railroads. It discloses a new contrivance for raising money and floating additional mortgage securities of railroad companies, which practically destroys all benefit of the "after-acquired property" clauses of modern mortgages. The court should hold parties claiming or asserting rights under such instruments as these under consideration to strict proof of their claims, if the transaction as conducted in this instance is upheld at all. The petitioner has, in the opinion of the court, shown a superior right to the three engines numbered 36, 37, and 38, inclusive, included in Schedule A to Lease B, No. 2. In re-

spect to the 1,100 coal cars numbered 4,200 to 5,299, inclusive, embraced in said schedule, the evidence leaves the question of the superior right as between petitioner and complainant in great doubt. Many of said cars were received and paid for before said Lease B, No. 2, was executed. The great majority of them were in the possession and service of the railroad company prior to March 1, 1882. How or by whom they were paid for does not appear; nor out of what particular funds. They were all contracted for originally by the railroad company. The president of the road subsequently, on the 25th of November, 1881, before the car trust under Lease B, No. 2, was ever formed, assumed the right to transfer that contract to a so-called "Ohio Central Car-Trust Association," not then in existence, which he undertook to represent. It is doubtful whether a transaction so suspicious, and conducted by the company's president, who was then, or shortly thereafter, the holder of car-trust certificates of the road to the amount of $50,000, should be sanctioned and sustained. It is not, however, deemed necessary to the determination of the present controversy to decide the question as to who has the superior right and title to the 1,100 coal cars. No rental was due thereon by the company, under the terms of the contract, till March 1, 1885. The company, and the receiver appointed September 30, 1883, had the right to use said cars free of charge till default was made in the payment of the first installment, maturing March 1, 1885. So far as the petitioner has established any right to or lien upon the equipment in controversy, it clearly appears that he has already been paid therefor by the company, and the receiver more than he, or those he represents, were entitled to, and his claims for further payments, and for additional compensation for the use of said equipment by the receiver, are disallowed, and his exceptions to the report of the special master are overruled. Complainant's exceptions to the report are sustained. The petitions of McGourkey, trustee, will be dismissed at his costs. He will be further taxed with the costs of the reference to the special master. The fund in court will remain subject to the further order of the court, and complainant is left at liberty to take such steps as may be deemed proper to recover possession of the equipment in question.