## WABASH RY. CO. v. AMERICAN REFRIGERATOR TRANSIT CO. et al. *

(Circuit Court of Appeals, Eighth Circuit. July 22, 1925.)

No. 6220.

**I. Appeal and error ⊚➾927(2) — Facts well pleaded must be accepted as true on motion to dismiss.**

Facts well pleaded in complaint must be accepted by reviewing tribunal as true on motion to dismiss.

**2. Corporations ⊚➾182—Property of corporation belongs to It and not to stockholders; stockholder cannot secure review of corporation management by directors if exercising their judgment in good faith.**

Property of a corporation belongs to it and not to stockholders, and a stockholder has no such title thereto as to enable him to assert ownership or control and to enter into possession thereof as against corporation, and stockholder cannot secure a review of management of corporation by its board of directors, elected by majority of the stock, if such board exercises its judgment in good faith and without fraud.

**3. Corporations ⊚➾152—Equity can interfere with directors' prerogatives as to declaring dividends only where there is bad faith or clear abuse of discretion.**

Declaration of dividends is within power of board of directors, and a court of equity can interfere with directors' prerogatives as to declaring dividends only where there is bad faith or clear abuse of discretion.

**4. Corporations ⊚➾182 — Rights of stockholders in corporate assets not superior to creditors'.**

Rights of stockholders in corporate assets are not superior to rights of creditors.

**5. Corporations ⊚➾378 — Courts will look through the form to get at real intent of association or corporations forming organization.**

It is immaterial what subsidiary companies, through which corporations carry on part of their business, are called, since courts will look through the form to get at the real intent of the association of individuals or corporations forming the organization, and, if rights of third parties have not intervened, will give effect to the real purpose of the organization, to promote square dealing and effectuate justice.

**6. Corporations ⊚➾378—Refrigerator company owned by carriers, held not an independent corporation but a subsidiary, corporate joint agency or trustee of carriers.**

Where carriers organizing refrigerator company at all times owned all of its stock, paying nothing therefor, selected its directors, and made carriers' officers its officers, and took from it all power to control its own profits, and directed and dominated its policies, refrigerator company not operating as common carriers of property, held that refrigerator company was not an independent corporation, but merely a subsidiary, corporate joint agency or trustee of carriers.

*Rehearing denied December 11, 1925.

**7. Corporations ⊚➾187 — Contracts between corporation stockholders valid, if not contravening public policy.**

Corporation stockholders may validly contract with each other, if contract does not involve rights of creditors, violate statutes, or contravene public policy.

**8. Corporations ⊚➾187 — Stockholders' contracts between carriers owning stock of refrigerator company, providing for distribution of refrigerator company's surplus, held valid.**

Stockholders' contracts between carriers owning stock of refrigerator company, providing that surplus accruing from all sources should be distributed (after payment of expenses and rentals of corporation) by refrigerator company to signatory carriers, in certain proportions therein specified, and leaving no discretion in refrigerator company as to how funds should be distributed, held valid.

**9. Corporations ⊚➾187 — Stockholders' contract held to effect an equitable assignment to carriers of surplus funds of refrigerator company, with an equitable lien thereon inferior to rights of creditors of refrigerator company.**

Stockholders' contract between carriers owning stock in refrigerator company, providing that surplus accruing from all sources should be distributed after payment of expenses and rentals of cars by refrigerator company to signatory carriers in certain proportions therein specified, held to effect an equitable assignment to such carriers and their successors of the surplus funds in proportions therein provided, and to create in their favor an equitable lien thereon, inferior to rights of creditors of refrigerator company.

**10. Corporations ⊚➾187—Use of surplus earnings by refrigerator company in purchasing cars and other property held to create a trust therein in favor of carriers owning stock in such company.**

Where stockholders' contract between carriers owning stock of refrigerator company provided that surplus accruing from all sources should be distributed, after payment of expenses and rentals of cars by refrigerator company to signatory carriers in certain proportions therein specified, use of such surplus earnings by refrigerator company in purchasing cars and other property created a trust as to such property in favor of signatory carriers, and imposed on refrigerator company duties of trustee in respect thereto.

**II. Contracts ⊚➾170(I)—Parties' construction given contract is persuasive in arriving at their intention.**

Construction given a contract by both parties through a long term of years is persuasive in arriving at intention and purpose of contracting parties.

**12. Corporations ⊚➾187 — Stockholders' contract providing for distribution of surplus of refrigerator company to carriers held to include earnings from foreign lines and any other outside sources.**

Stockholders' contract between carriers owning stock in refrigerator company, provid-

ing that "whatever surplus accruing from all sources" should remain after payment of expenses and rentals should be distributed to signatory carriers in certain percentages therein specified, *held*, in view of practical construction by the parties, to include earnings of company from foreign lines and any other outside sources, in addition to revenue derived from business done over lines of signatory carriers.

**13. Corporations ⊜187 — Stockholders' contract between carriers for distribution of profits from refrigerator company held not to include installments of purchase price of cars purchased under "car trust agreements"; "rentals upon leased cars."**

Stockholders' contract between carriers owning stock in refrigerator company, providing for distribution of refrigerator company's surplus to signatory carriers in proportions therein specified, after refrigerator company's payment of its "rentals upon leased cars," *held* not to include installments of purchase price of cars purchased by refrigerator company on conditional sales contracts, commonly known as "car trust agreements," evidenced by interest-bearing equipment trust notes.

**14. Corporations ⊜187—Carrier, entitled under contract to proportion of surplus profits of refrigerator company, not compelled to wait until expiration of company's corporate charter in order to seek equitable relief.**

Under stockholders' contract between carriers owning stock in refrigerator company, providing that surplus accruing from all sources should be distributed by refrigerator company to signatory carriers in certain proportions therein specified, carrier *held* not compelled to wait until expiration of corporate charter of refrigerator company to seek equitable relief to enforce its rights under the contract, in view of attempt to wipe out by arbitrary action such contract, threat to mortgage or sell the cars or other property bought with surplus earnings, and repudiation by refrigerator company of its duties as trustee.

**15. Arbitration and award ⊜1—Arbitration is favored by the courts.**

Arbitration is favored by the courts.

**16. Arbitration and award ⊜18 — Submission of matter to arbitration implies agreement to be bound thereby.**

Submission of matter in controversy to arbitration carries with it implied agreement to be bound thereby.

**17. Contracts ⊜284(4)—Decision of arbitrator in controversy as to construction of contract held binding, in absence of claim of fraud or mistake.**

Decision of arbitrator, in controversy as to construction of contract providing for distribution of surplus of refrigerator company to carriers in certain proportions therein specified, *held* binding on parties to arbitration, in absence of claim that his decision was the result of fraud, partiality, misfeasance, or palpable mistake, resulting in an injustice to either party, or that he went beyond scope of question submitted.

**18. Arbitration and award ⊜66—Every reasonable intendment indulged in favor of an award under arbitration agreement.**

Every reasonable intendment is indulged in favor of an award under an arbitration agreement, where there is no claim that decision of arbitrator was the result of fraud or mistake resulting in injustice to either party, or that he went beyond scope of questions submitted.

**19. Appeal and error ⊜714(5)—No review of questions not based on record.**

Reviewing tribunal will not pass on questions suggested only in the briefs and not in any way based on the record.

Appeal from the District Court of the United States for the Eastern District of Missouri; Charles B. Faris, Judge.

Suit in equity by the Wabash Railway Company against the American Refrigerator Transit Company and another. From a decree of dismissal, plaintiff appeals. Reversed and remanded, with directions.

This is an appeal from an order and decree of the District Court of the United States for the Eastern District of Missouri, dismissing, upon motions of the American Refrigerator Transit Company and the Missouri Pacific Railroad Company, appellees, appellant's amended bill of complaint.

The original action in equity in said District Court, against appellees claiming certain equitable relief, was upon motion of appellees dismissed. Appellant was given 10 days within which to further plead. During said time it filed the amended bill of complaint. The trial court was of the opinion that the amended bill did not state facts upon which equitable relief could be based.

[1] For the purpose of passing on the assignments of error, the facts, well pleaded in the amended bill of complaint, must be accepted by us as true. They may be summarized as follows:

On or about February 14, 1881, the Missouri Pacific Railway Company, the St. Louis, Iron Mountain & Southern Railway Company (predecessors of the Missouri Pacific Railroad Company), and the Wabash, St. Louis & Pacific Railway Company (predecessor of appellant), organized under the laws of the state of Illinois, a corporation known as American Refrigerator Transit Company, with an authorized capital stock of $500,000, divided into 5,000 shares of the par value of $100 each; the said railroad companies at that time owning, or operating under leases, lines of railroad in Missouri, Kansas, Arkansas, and other states. The capital stock of the refrigerator company

was issued to said three railroads in equal proportions, viz. one-third to each. Nothing was paid for said stock.

The said refrigerator company was organized for the purpose of creating therein a joint instrumentality or agency of the three railroad companies for carrying on the business affairs incident to the solicitation of perishable freight for transportation over the various lines of railroads owned and operated by said railroad companies, and for the operation and management of what was commonly known as refrigerator cars for the conserving in transportation of perishable freight.

The refrigerator company, owning no cars or other property, and, having no funds with which to carry on its operations, the Missouri Pacific Railway Company, the St. Louis, Iron Mountain & Southern Railway Company, and the Wabash, St. Louis & Pacific Railway Company contributed to it in equal proportions $50,000 to be used as a working fund, and turned over to it 100 refrigerator cars from each of said railroad companies, for the use of which the refrigerator company was to pay a rental of $5 per month per car. In 1887 the St. Louis, Iron Mountain & Southern Railway Company and the Missouri Pacific Railway Company placed 469 additional refrigerator cars with the refrigerator company for the same purpose and on the same terms as the original contribution.

A written contract was entered into July 1, 1881, between said refrigerator company and said railroad companies, which provided that the refrigerator company was to furnish to said railroad companies refrigerators cars to transport over the lines of railroad operated by said companies goods requiring refrigeration, and in consideration thereof the refrigerator company was to receive one cent per mile for every mile that any refrigerator car furnished by it should be run over the respective lines of railroad, and further was to receive a commission of 12½ per cent. of the freight revenues which each railroad company should receive for the transportation of said goods over its lines.

On the same date, viz. July 1, 1881, the railroad companies entered into another contract (called a stockholders' contract) with each other and with the refrigerator company, in which it was agreed that, in order to provide a fair, just, and equal distribution among themselves of the profits arising from the business of said refrigerator company, there should first be paid from the

earnings of said refrigerator company all the operating and other necessary expenses of every kind, including in said expenses rentals paid on leased cars, and that the sum remaining after payment of these expenses should be distributed among the railroad companies "in the proportion which the business done and money earned over the roads or lines of each party shall bear to the whole earnings of said first party during the period for which such distribution is made; the several parties hereto hereby agreeing to the payment of dividends in that proportion of their stock."

It was further provided by the contract that "all certificates of stock in the American Refrigerator Transit Company shall contain full reference to this agreement and be expressly subject to all of its provisions."

The Missouri, Kansas & Texas Railway Company signed the original operating and stockholders' contracts of 1881. The amended bill of complaint does not treat this railroad as interested in the controversy. The record is not clear as to when or how the interest of the Missouri, Kansas & Texas Railway Company ceased, but, as neither party to this controversy makes any claim or suggestion as to any rights on its part, no further reference will be made to it in this opinion.

The refrigerator company and the railroad companies, signatories to the contracts, or their successors in interest, operated under these 1881 contracts until January 1, 1894. During that time the Wabash Railroad Company (predecessor in interest of appellant) had acquired all rights theretofore owned by the Wabash, St. Louis & Pacific Railway Company. Under the operations of the refrigerator company up to January 1, 1893, the contributions of the St. Louis, Iron Mountain & Southern Railway Company and the Missouri Pacific Railway Company to the surplus earnings of said refrigerator company greatly exceeded the contributions to such surplus earnings by the Wabash, St. Louis & Pacific Railway Company and its successor, the Wabash Railroad Company, and greatly exceeded the amount required by the refrigerator company to pay its operating expenses.

The result of these operations was that on January 1, 1893, the accumulated surplus revenues of the refrigerator company subject to distribution among the three railroad companies in the proportion as provided by said stockholders' contract of 1881, amounted to $503,790.46—the share of the Missouri Pa-

7 F.(2d)—22

cific Railway Company being $93,707.08, or 18.6 per cent.; the St. Louis, Iron Mountain & Southern Railway Company, $287,445.44, or 57.057 per cent.; the Wabash, St. Louis. & Pacific Railway Company and its succes-. sor, the Wabash Railroad Company, $122,- 637.94, or 24,343 per cent. of the total.   :·.

During the year 1893 the railroad companies agreed among themselves to a plan of capitalization that, in lieu of distributing this. fund in cash in the proportions provided by the stockholders' contract, the capital stock of the refrigerator company, which up to that time had been held in equal proportions by the three railroad companies, should be redistributed among said companies in the proportion that the contributions to the surplus revenues of said refrigerator company by each of the railroad companies bore to the total surplus revenues of said company. This was done, and the Missouri Pacific Railway Company received 18.6 per cent. of the capital stock, or 930 shares; the St. Louis, Iron Mountain & Southern Railway Company received 57.057 per cent., or 2,853 shares; and the Wabash Railroad Company (successor of the Wabash, St. Louis & Pacific Railway Company) received 24.343 per cent. or 1,217 shares.

January 1, 1894, these railroad companies and the refrigerator company entered into a new operating contract for the same purposes, and providing for the same payments of commissions and car mileage as the original operating contract of 1881. It was substantially a re-execution of that contract, the differences being slight. On the same day said refrigerator company entered into a new stockholders' contract with the three railroad companies, which is similar to the original stockholders' contract of 1881, but has some differences. This contract contained the following provisions:

"Now, therefore, the said parties of the second part, being desirous of providing for a fair, just, and equitable distribution of the profits accruing to said party of the first part, have agreed among themselves, each with the other, and with said party of the first part in manner following, that is to say:

"The revenue or earnings from the business of said party of the first part shall be · distributed in the ·manner following, to wit:

"(1) There shall be first paid from such earnings all the operating and other necessary expenses of said party of the first part, of every kind whatsoever, including in said expenses, its rentals upon leased cars.

·"(2) Whatever surplus accruing from all sources shall, remain after payment of the expenses and rentals above mentioned, shall be distributed among the three parties hereto of the second part, upon percentages arrived at by taking the revenue derived from the business done over the roads or lines of each party of the second part as a basis, applying same to the whole surplus of said party of the first part during the period for which such distribution is made; the several parties hereto hereby agreeing to the payment of dividends in that proportion on their. stock.

"(3) It is further agreed that each of the parties' hereto of the second part shall hold its stock in said American Refrigerator Transit Company subject to all the provisions of this contract, and in the event that they, or either of them, transfer or assign said stock, or any share or shares thereof, to any other person or persons, such transfer shall be subject to all the provisions hereof.

"To that end, all certificates of stock in the American Refrigerator Transit Company shall contain full reference to this agreement, and be expressly subject to all of its provisions."

The terms "surplus accruing from all sources" and "whole surplus," as used here, do not appear in the stockholders' agreement of 1881.

The business of the refrigerator company continued as theretofore until May, 1898, when a new refrigerator company was organized under the laws of the state of New Jersey, and it took over all the liabilities, debts, contracts, and obligations of the original American Refrigerator Transit Company. A formal transfer was made, which appears as an exhibit to the amended bill of complaint. The obligations of the old company were assumed by the new one. It was organized by the same railroad companies, or their successors, for the same purpose as the old company, and has carried on the work for the railroad companies in the solicitation of perishable freight and the operation of refrigerator cars under the terms of the operating and stockholders' contracts of January 1, 1894, the same as had been done by the original refrigerator company.

The refrigerator companies, since January 1, 1894, pursuant to the direction and authority of the railroad. companies, have purchased approximately 5,500 refrigerator cars—2,000 of the same were paid for from the surplus revenues of said refrigerator

companies, which otherwise would have been paid, according to the terms of the contract of January 1, 1894, to the railroad companies in the proportions therein provided; 3,500 of the cars were purchased under contracts whereby a part of the purchase price was paid in cash, and the balance was to be paid in installments maturing from time to time. To secure payment of these balances, the three railroad companies, by their managing officers, authorized the refrigerator frigerator companies did execute and deliv- companies to execute and deliver, and the re- er, in their name, certain conditional sale agreements commonly known as "Car Trust Agreements," which provided for the execution and delivery by the refrigerator company to the trustee named therein, of interest-bearing equipment trust notes, to cover the various stated installments of the unpaid purchase price of said cars, and also that the legal title to the cars purchased should remain in the vendor until all installments of the purchase price were paid. As the various installments of the purchase price of the cars so purchased and evidenced by the equipment trust notes issued as aforesaid have become due, the refrigerator company issuing such notes has, by direction and authority of the said three railroad companies, paid these notes from the surplus revenues of the refrigerator companies which, under the provisions of the stockholders' contract of January 1, 1894, would otherwise have been divided among the railroad companies in the proportion which they respectively contributed to such surplus revenues. The amount so expended by the refrigerator company for such cars and other property exceeds $4,000,000.

Since January 1, 1894, the surplus revenues of the two refrigerator companies, except as applied to the payment of cars and other properties, have been distributed and paid over to the three railroad companies or their successors in the percentage or proportion that the contribution by each to the gross revenues of the refrigerator companies bore to the total amount of the surplus revenues then to be distributed.

From the organization of the original refrigerator company down to 1917, the Missouri Pacific Company and the Iron Mountain Company were operated as a system of railroads under common control and management, and the separate holdings of stock of both companies in the refrigerator companies were combined and voted as a unit at all meetings. They have thereby dominated and controlled the business and affairs of said refrigerator companies by the election of their officers and agents as a majority of the members of the boards of directors of said companies.

From 1881 to 1903, the contributions of the Missouri Pacific and the Iron Mountain Companies to the operating expenses of the refrigerator companies, under the operating agreement then in force, exceeded the contributions of the Wabash Company. About the year 1903 this situation commenced to change, and, from 1903 up to the time in 1917 of the attempted cancellation of the operating contract of 1894 by the refrigerator company, the contributions of the Wabash Company to the expenses and to the surplus earnings of the refrigerator companies at times exceeded the combined contributions of the Missouri Pacific and the Iron Mountain Companies.

During the years when the Missouri Pacific and Iron Mountain Companies were receiving the larger share of surplus earnings by reason of larger contributions thereto, the railroad companies and the refrigerator companies construed the original stockholders' contract and the stockholders' contract of January 1, 1894, as constituting an assignment to the railroad companies, respectively, of the surplus earnings of the refrigerator companies.

Each of said parties to said operating and stockholders' contract, and their successors in interest, acted upon the construction so given to said stockholders' contracts, by refunding and paying over to the three railroad companies the accumulated surplus earnings from year to year in the respective proportions that said three railroad companies contributed to the earnings of the refrigerator companies under the terms of the operating contracts.

This construction of the original stockholders' contract of 1881 and of the stockholders' contract of January 1, 1894, was not questioned until the time that the contributions of the Wabash Railroad Company to the earnings exceeded the combined contributions of the Missouri Pacific and Iron Mountain Companies.

In 1911 the appellee refrigerator company and the Missouri Pacific and Iron Mountain Companies for the first time asserted that the surplus earnings of the refrigerator company did not belong, either in law or equity, to the said three railroad companies in the proportion that said railroad companies contributed to such earnings, as provid-

ed for by the terms of the operating contract of January 1, 1894, or in any other proportion, but that the surplus earnings of the refrigerator companies, which had been invested in refrigerator cars and other properties, had lost their character as surplus, and were no longer distributable to the stockholders on the basis of the stockholders' contract of January 1, 1894; that such cars or other property purchased in the name of the refrigerator companies, and wholly or partially paid for from surplus earnings, were owned and held by the refrigerator company, free and clear of any claim of title or interest, either legal or equitable, of the appellant or its predecessor, except such interest as appellant might have as a stockholder of appellee refrigerator company, without regard to, and independent of, the provisions of said stockholders' contract; and that, in any event, so much of the surplus as was derived by appellee refrigerator company, from earnings on railroad lines other than those of the stockholding railroad companies, should be distributed among the stockholding railroad companies on the basis of their respective stock ownership, and not upon the basis of the stockholders' contract of January 1, 1894.

The matter of controversy was in the year 1911 submitted by the Missouri Pacific Railway Company, the St. Louis, Iron Mountain & Southern Railway Company, and the Wabash Railroad Company, owners of all the capital stock of the American Refrigerator Transit Company, to one Lawrence Greer, Esq., as arbitrator, together with the statements of the respective claims and contentions of the parties to the controversy, "with the understanding and agreement that all parties would accept and abide by the facts and decision of said arbitrator."

We do not find in the record the arbitration agreement. The opinion of the arbitrator appears, however, as an exhibit to the amended bill. The arbitrator decided that the stockholding railroad companies were entitled to interest in the cars of the refrigerator company purchased by it out of the surplus revenues, which otherwise might have been distributed in payment of dividends, upon the same basis and in the same proportion as provided in the stockholders' contract of January 1, 1894, with respect to the distribution of surplus of the refrigerator company, and irrespective of whether such surplus was derived from business done over the lines of the stockholding railroad companies or of other railroad companies.

Subsequent to the submission of the matter to the arbitrator, and prior to his decision in February, 1912, receivership proceedings were instituted against the Wabash Railroad Company, and receivers were appointed to take charge of its lines of railroad. The receivers of the Wabash Railroad Company conferred with the officers of appellee refrigerator company and of the Missouri Pacific Railway Company and the St. Louis, Iron Mountain & Southern Railway Company for the purpose of securing action on the part of the railway companies in carrying out the award of the arbitrator. Objection was made by the officials of the refrigerator company and of the Missouri Pacific Railway Company and St. Louis, Iron Mountain & Southern Railway Company, based on various grounds, and the matter was further complicated by provisions and covenants contained in certain mortgages of the Missouri Pacific Railway Company and the St. Louis, Iron Mountain & Southern Railway Company.

No action was brought to enforce the award, and subsequent thereto receivers were appointed of the Missouri Pacific Railway Company and the St. Louis, Iron Mountain & Southern Railway Company, and the award was never put into effect.

Appellant was willing at all times, and is now willing, to accept the decision of the arbitrator or referee. Appellees have refused and continue to refuse so to do.

In March, 1917, the Missouri Pacific Company and the Iron Mountain Company dominating the refrigerator company, caused its president, who was also vice president of the Missouri Pacific and the Iron Mountain Companies, to serve upon the Wabash Railroad Company and the other railroad companies written notice to the effect that the appellee refrigerator company would no longer be bound by the terms and provisions of the stockholders' contract of January 1, 1894, or by the terms and provisions of the operating contract of January 1, 1894, and that it (refrigerator company) elected to terminate both contracts. At this time a majority of the members of the board of directors of appellee refrigerator company were the officers and agents of the Missouri Pacific and Iron Mountain Companies, and the executive officers of the refrigerator company were likewise officers and agents of the Missouri Pacific and Iron Mountain Companies. The Missouri Pacific and the St. Louis, Iron Mountain & Southern Companies acquiesced in and accepted the act of

appellee refrigerator company, terminating said operating and stockholders' contracts of January 1, 1894.

The operating contract was subject, by its terms, to cancellation on 60 days' notice. The stockholders' contract contained no such provision. Appellant or its predecessor refused to accept or be bound by the notice of cancellation of said stockholders' contract by the president of the refrigerator company.

Appellant has acquired, by transfer and assignment to it, the property and rights theretofore owned or held by the Wabash Railroad Company, including the rights of said Wabash Railroad Company under the operating and stockholders' contracts of January 1, 1894.

Appellee the Missouri Pacific Railroad Company has by transfer and assignment acquired the railroads' property and property rights owned by the Missouri Pacific Railway Company and the St. Louis, Iron Mountain & Southern Railway Company, including rights under the operating and stockholders' contracts of January 1, 1894.

The appellee refrigerator company now asserts that it has the right to sell, mortgage, and lease the refrigerator cars and other properties acquired by payment out of surplus revenues, free of any interest of appellant therein, and to exclude appellant from the use of the soliciting and operating organization of said refrigerator company, that it has threatened and is now threatening to mortgage said refrigerator cars and other properties, and to lease the same for a long term of years to railroad companies other than the appellant, and that it will carry out such threats and deprive appellant of any rights it may have under the stockholders' contract of January 1, 1894. The appellees, although often requested by the appellant and its predecessor to abide by and perform the stockholders' contract of January 1, 1894, refuse so to do.

These facts, gathered from the amended bill of complaint, are the basis of appellant's contention that the appellee refrigerator company is the corporate joint agency, instrumentality, or trustee of the various railroad companies signing the contracts of January 1, 1894, and their successors in interest, to assist in carrying on more economically the business of said railroad companies in handling goods requiring refrigerator cars; that it acquired merely the naked legal title of the cars and properties purchased out of its surplus funds, and that appellant, as assignee and successor in in-

terest of the Wabash Railroad Company and the Wabash, St. Louis & Pacific Railway Company on the one hand, and the Missouri Pacific Railroad Company as successor in interest of the Missouri Pacific Railway Company and the St. Louis, Iron Mountain & Southern Railway Company on the other hand, have an equitable interest in the properties and assets standing in the name of the refrigerator company; that the stockholders' contract of January 1, 1894, constitutes an equitable assignment by the refrigerator companies of all the surplus revenues of said companies to the railroad companies, and creates an equitable lien in favor of each of the railroad companies, parties to said contract, or their successors, upon said surplus earnings of the refrigerator companies in such proportions as provided in said contract; that the refrigerator cars and properties of the refrigerator companies, paid for in whole or in part by the use of such surplus earnings, are impressed with a resulting trust in favor of the appellant and the Missouri Pacific Railroad Company; that the decision of the arbitrator, Lawrence Greer, Esq., should be enforced as against the appellees; and that the action of the refrigerator company and appellee Missouri Pacific Railroad Company, in attempting to cancel the stockholders' contract of January 1, 1894, in March, 1917, should be set aside, and that the court should decree specific performance of said contract.

N. S. Brown, of St. Louis, Mo. (L. H. Strasser and Homer Hall, both of St. Louis, Mo., on the brief), for appellant.

Edward J. White, of St. Louis, Mo., for appellees.

Before SANBORN, LEWIS, and KENYON, Circuit Judges.

KENYON, Circuit Judge (after stating the facts as above). Wide divergence exists in the theories of the respective parties.

Appellees contend the suit is an attempt of a minority stockholder to recover against the corporation a definite portion of the corporate assets, on the theory that such assets represent deferred dividends which the board of directors should have declared but did not.

Appellant's theory is that the suit is not one to review corporate acts, or to bring about a dissolution of the refrigerator company, or to secure control of said corporation; that the question of discretionary power in the board of directors of said com-

pany is not involved, as the terms of the stockholders' contract of January 1, 1894, make mandatory the distribution of surplus earnings to the parties thereto in proportions there provided; that the action is one to declare and define a trust relationship of the refrigerator company to the appellant and appellee Missouri Pacific Company and to compel the refrigerator company to carry on its business as such trustee according to the terms of the stockholders' contract of January 1, 1894, and the purposes of its creators.

In ruling on the motions to dismiss, the trial court said: "The charter of the American Refrigerator Transit Company surely conferred on it the power to hold its own property, and to manage and operate its own business in its own way, till it by some overt act hurt the rights of plaintiff, or of some other stockholder." And again: "Thus considered, the matter seems to be a simple contest over the control of a corporation; that is, whether plaintiff, with its 25 per cent. holdings of the corporate stock of the American Refrigerator Transit Company, or defendant railroad, with its 75 per cent. of those holdings, shall manage and control the business of defendant American Refrigerator Transit Company. With this question, I take it, the courts have nothing to do, so long as the subsisting control, in whomsoever vested, shall be had in such wise as not to hurt those stockholders who are out of control. Neither an actual, threatened, nor even a contingent hurt, having been shown by the bill, and none, in my view, being possible till there shall happen an overt act inimical to the alleged rights of plaintiff under the alleged contract of January 1, 1894, I am of opinion that plaintiff has no standing in equity." It is evident that the learned trial court considered the bill merely as an attempt of a minority stockholder to interfere with the management of a corporation, and the contest one for control thereof.

[2-4] It is elementary that the property of a corporation belongs to it and not to the stockholders, and a stockholder has no such title thereto as to enable him to assert ownership or control, or to enter into possession thereof as against the corporation; nor can a stockholder secure a review of the management of the corporation by its board of directors elected by the majority of the stock if such board exercise its judgment in good faith and without fraud. Likewise the declaration of dividends is within the power of the board of directors, and a court of equity can interfere with directors' prerogatives as to declaring dividends only where there is bad faith or clear abuse of discretion. Nor are the rights of stockholders in the corporate assets superior to the rights of creditors. These general principles of corporation law are not denied by appellant; it contending they are not applicable to the corporate status of the refrigerator company, claimed to be differentiated from the ordinary corporation by contract arrangements made with and between all its stockholders.

I. If appellee American Refrigerator Transit Company (herein designated as the refrigerator company) is the usual, ordinary, independent corporation, with all the powers ordinarily incident thereto, and if this case, as claimed by appellees, is merely an attempt of a minority stockholder to have the affairs of the corporation wound up and its assets distributed to the stockholders because of the investment of corporate income in refrigerator cars and other property, then this opinion could be abbreviated, as suggested difficulties would disappear. To so hold, however, would necessitate closing our eyes to the allegations of the amended bill of complaint, and giving no force or effect to the operating and stockholders' contracts.

The purpose of the parties in organizing the original refrigerator company in 1881, and the appellee refrigerator company in 1898, is shown by the circumstances surrounding such transactions and the method in which the business has been subsequently carried on. The amended bill charges that said original refrigerator company "was organized for the purpose of creating in said corporation a joint instrumentality or agency of the said three railroad companies for the carrying out of all the business and affairs usually incident to the solicitation of certain perishable freight for transportation over the various lines of railroad then owned and operated by said three railroad companies, and the operation and management of what are commonly known as refrigerator cars."

The stock thereof was issued to the railroad companies, signatories to the original contracts, without the payment of any money or property therefor. Said railroad companies contributed the sum of $50,000, in equal proportions, to provide funds for its initial operations, and also contributed a large number of refrigerator cars. At the time of its (original refrigerator company's) organization the railroad companies inter-

ested therein and owners of all the stock entered into two contracts with it bearing the same date, which have been designated respectively as "operating" and "stockholders'" contracts. The preamble to said operating contract, as follows, assists in clarifying the purpose of the organization:

"That for and in consideration of the several covenants and agreements hereinafter contained, to be kept and performed by the respective parties hereto, and in further consideration of the fact that the party of the first part will, in pursuance hereof, expend large sums of money in the manufacture or purchase of cars and other equipments required under the terms of this agreement, and in further consideration of the fact that the business of the said parties of the second part will, under this agreement, be largely increased and greater safety secured in the transportation of all kinds of perishable property over the various lines of railroads owned and operated by said parties of the second part; it is therefore stipulated and agreed by and between the parties hereto, as follows, to wit."

The railroad companies agreed in said operating contract to pay the refrigerator company a car mileage of one cent per mile and a 12½ per cent. commission on freight revenues derived from freight carried in the cars furnished and managed by it.

The stockholders' contract of even date provided for the distribution of earnings after the payment of operating expenses and rentals on leased cars.

The new operating and stockholders' contracts of January 1, 1894, superseded those of 1881. The operating contract was substantially the same as the former one. The stockholders' contract contained some new and important provisions as to the distribution of surplus revenues derived from all sources (to which reference is made in another part of the opinion); the business at that time having expanded beyond the original plan, which embraced only the business on the lines of the railroad companies, parties to the original contract, and their successors in interest.

It is apparent that under the operating contracts the railroad companies undertook to carry on all the business of transportation, except the solicitation of perishable freight and the furnishing of refrigerator cars therefor. The same purpose runs through the various contracts.

We have then a situation presented where the railroad companies, signers of these contracts, and their successors in interest, have at all times owned all the stock of the appellee refrigerator company and its predecessor, paying nothing therefor, have selected its directors, have made the railroad companies' officers its officers, have shorn it of all power to control its own profits, and have directed and dominated its policies. No discretion was left to either refrigerator company as to the payment of dividends. The directions in both contracts as to the distribution of the surplus earnings were mandatory. It may be suggested also that the refrigerator companies have not operated in any way as common carriers of property, have not filed schedules of rates or issued bills of lading. Both stockholders' contracts contained the following:

"It is further agreed that each of the parties hereto of the second part shall hold its stock in said American Refrigerator Transit Company subject to all the provisions of this contract, and in the event that they, or either of them, transfer or assign said stock, or any share or shares thereof, to any other person or persons, such transfer shall be subject to all the provisions hereof. To that end, all certificates of stock in the American Refrigerator Transit Company shall contain full reference to this agreement, and be expressly subject to all of its provisions."

The stockholders' contract of January 1, 1894, has carried forward the same ideas as embodied in the original stockholders' contract, and provides that the right of stockholders, as such, to surplus earnings, are subordinated to the rights created by the stockholders' contract. The disposal of surplus earnings is to be made, not in the usual manner of corporations according to ownership of shares, but according to the provisions of contracts entered into between the refrigerator companies and all their stockholders, embodying agreements also to the same purpose between all the stockholders. This arrangement was made when the original refrigerator company was organized and was carried into the organization of appellee refrigerator company. These rights as to the distribution of the surplus earnings, while unusual and somewhat novel, certainly differentiate the corporate character of the appellee refrigerator company and its predecessor from that of the usual and ordinary corporation. Very little seems to remain of corporate independence.

[5] If corporations carry on part of their business through subsidiary companies, it makes little difference what such companies may be called; there is no particular divin-

ity surrounding the term "corporation." The courts will look through the form to get at the real intent of the association of individuals or corporations forming the organization, and, if rights of third parties have not intervened, will give effect to the real purpose of the organization in order to promote square dealing and effectuate justice.

The Supreme Court considered a somewhat similar question in Chicago, Milwaukee & St. Paul Railway Co. et al. v. Minneapolis Civil & Commerce Association, 247 U. S. 490, 498, 38 S. Ct. 553, 556, 62 L. Ed. 1229. The Minneapolis Eastern Railway Company was organized under the laws of Minnesota by a group of millowners, for the purpose of building a railroad from Minneapolis to St. Paul. Before the right of way was acquired, two railroad companies, through stock ownership, secured control of the corporation, elected a board of directors, and took charge of the affairs of the said Minneapolis Eastern Railway Company. Said company after its organization entered into a contract with the railroad companies by which its control and operation vested in them. Tariffs were filed with the Interstate Commerce Commission, and an attempt made to impose a separate charge as an independent railroad for switching over its limited tracks. The question before the court was whether the Minneapolis Railway Company was an independent corporation. The court said: "It is difficult to conceive of a plan for the control of a jointly owned company and for the operation of a jointly owned track more complete than this one is and it is sheer sophistry to argue that, because it is technically a separate legal entity, the Eastern Company is an independent public carrier, free in the conduct of its business from the control of the two companies which own it."

The railroad companies contended that the Minneapolis Eastern Railway Company was a separate entity and that the ownership of stock by the railroad companies did not create the relationship of principal and agent. As to this the Supreme Court said: "While the statements of the law thus relied upon are satisfactory in the connection in which they were used, they have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies. * * * In such a case the courts will not permit themselves to be blinded or deceived by mere forms or law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require."

In Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 521, 31 S. Ct. 279, 286 (55 L. Ed. 310), Mr. Justice McKenna in referring to and distinguishing the case of Weems Steamboat Co. v. People's Co., 214 U. S. 345, 29 S. Ct. 661, 53 L. Ed. 1024, 16 Ann. Cas. 1222, said: "Another and important fact is the control of the properties by the Southern Pacific Company through stock ownership. There is a separation of the companies if we regard only their charter; there is a union of them if we regard their control and operation through the Southern Pacific Company. This control and operation are the important facts to shippers."

In Chicago, Milwaukee & St. Paul Railway Co. et al. v. Des Moines Union Railway Co. et al., 254 U. S. 196, 206, 41 S. Ct. 81, 85 (65 L. Ed. 219), the Supreme Court considered the relationship of the railroads involved to a terminal company. The terminal company had the title to the properties, and entered into operating contracts with the railroad companies. Afterwards the terminal company asserted that it was the absolute owner of the terminal properties, and that the railroad companies were merely stockholders in the usual and customary sense, that the terminal company was entitled to its surplus earnings, and that the railroads as stockholders of the terminal company should not be permitted to deny the absolute ownership of the properties standing in the name of the terminal company. It was the contention of the railroad companies that the terminal company was merely an instrumentality or trustee of the proprietary companies, and that they were the owners of the equitable title to such properties. The Supreme Court said: "Upon a review of all the evidence, construing the writings in the light of the circumstances and the manifest purpose and intent of the parties, we are clear that the effect of the transactions thus far recounted was to establish a trustee in the full and proper sense of the word, the terminal company being invested as trustee with complete legal title, but without beneficial ownership, and subject to a duty to maintain and operate the property and exercise all its corporate powers for the common use and benefit of

the three railroad companies, their successors and assigns, and such other companies as might be admitted by them to a proprietary participation in the terminal."

The case was in this court (254 F. 927, 166 C. C. A. 289). Judge Hook, in a dissenting opinion said (page 953 [166 C. C. A. 315]): "In both aspects of its position towards the proprietary companies the terminal company was in a high sense their trustee, and according to salutary principles it was bound to maintain the integrity of that relation." The Supreme Court of the United States as to this question took practically the same position as Judge Hook. That case differs from the present one in that the title to the property there was, by written agreement, placed in the terminal company to be held as trustee for the railroad companies. There is no such agreement here. Some of the principles, however, enunciated in that case are applicable in the present one.

In United States v. Lehigh Valley Railroad Co. et al., 254 U. S. 255, 41 S. Ct. 104, 65 L. Ed. 253, the court concluded the coal companies were under the domination of the railroad company and were mere agencies thereof. See, also, The Willem Van Driel, St., 252 F. 35, 164 C. C. A. 147; Specht v. Missouri Pac. R. Co., 154 Minn. 314, 191 N. W. 905.

[6] The allegations of fact in the amended bill, supplemented by the contents of the operating and stockholders' contracts of 1881 and 1894, attached to the same as Exhibits A, B, C, and D, and the method of carrying on business by the refrigerator company and its predecessor, convince that the purpose the railroad companies had in view in organizing the refrigerator companies was to create a trust and to provide a corporate instrumentality or agency to be utilized in holding the legal title to the trust property while administering the same in accordance with the agreement of the beneficiaries, and that the appellee refrigerator company is not, nor was its predecessor, an ordinary, independent corporation, dealing at arms' length with the interested railroad companies, but is merely a subsidiary, corporate joint agency or trustee of appellant and appellee Missouri Pacific Company.

Our conclusion as to the limited rights and powers of the appellee refrigerator company is based in part at least upon the assumption that the contracts, especially the stockholders' contract of 1894, were valid. We know of no reason why such contracts as are attached to the amended bill of complaint as Exhibits A, B, C, and D cannot exist between a corporation and its stockholders, where they are made in good faith, are not detrimental to the interests of the corporation or the rights of creditors, are violative of no statute, nor contrary to public policy.

Cook on Stock, Stockholders, and Corporation Law (2d Ed.) § 4a, p. 7, states the rule as follows: "A corporation may contract with its stockholders to the same extent and in the same manner that it may with any other persons."

In Scovill v. Thayer, 105 U. S. 143, 153, 26 L. Ed. 968, this language is used: "The stock held by the defendant was evidenced by certificates of full paid shares. It is conceded to have been the contract between him and the company that he should never be called upon to pay any further assessments upon it. The same contract was made with all the other shareholders, and the fact was known to all. As between them and the company this was a perfectly valid agreement. It was not forbidden by the charter or by any law or public policy, and as between the company and the stockholders was just as binding as if it had been expressly authorized by the charter."

In Chicago, M. & St. P. Railway Co. v. Des Moines Union Ry. Co. et al., 254 F. 927, 166 C. C. A. 289, this court recognized the validity of the contract between the terminal company and its stockholding proprietary companies respecting the ownership and distribution of the surplus earnings. While the case was reversed by the Supreme Court (254 U. S. 196, 41 S. Ct. 81, 65 L. Ed. 219), this proposition was sustained.

[7, 8] The contracts here were not only between the corporation and the stockholders, but were likewise contracts between the stockholders themselves. It is the general voice of authority that the stockholders of a corporation may contract with each other, and that such contracts will be valid, provided they do not involve the rights of creditors, violate statutes, or contravene public policy. Manson v. Curtis, 223 N. Y. 313, 119 N. E. 559, Ann. Cas. 1918E, 247; Powers-Buchanan Co. v. Powers, 269 Pa. 388, 112 A. 541; Kantzler v. Benzinger et al., 214 Ill. 589, 73 N. E. 874; Hladovec v. Paul et al., 222 Ill. 254, 78 N. E. 619; Jones v. Brown, 171 Mass. 318, 50 N. E. 648; State ex rel. Frank et al. v. Swanger, 190 Mo. 561, 89 S. W. 872, 2 L. R. A. (N. S.) 121, 4 Ann. Cas. 563; Fletcher's Cyc. of Corpo-

rations, vol. II, § 3673; Cook on Corporations, vol. 2 (6th Ed.) § 622, subds. a, b, and c. The contracts under consideration do not fall within any of these inhibitions. They were valid agreements, binding on the parties, their successors or assigns. We refer later to the questions involved in the attempt to cancel the contract of January 1, 1894, by the refrigerator company.

II. Did the stockholders' contract of January 1, 1894, constitute an equitable assignment to the three railroad companies, parties thereto, and their successors in interest, in the proportions therein provided, of all the surplus earnings referred to in paragraph 2 thereof, and create an equitable lien thereon?

Did the utilization of such surplus earnings by the refrigerator companies in the purchase of cars and other properties create a trust as to such properties in favor of said railroad companies which a court of equity will enforce?

It is to be noted that the contributions of money and cars made by the respective railroad companies signing the original contracts made it possible for the refrigerator companies to accumulate a part at least of the surplus funds existing at different times. The stockholders' contract of January 1, 1894, provides that the surplus accruing from all sources shall be distributed (after payment of expenses and rentals of cars) by the refrigerator company to the three railroad companies, signers of the same, in certain proportions therein specified. There was no discretion in the refrigerator company as to how the fund should be distributed. It was under the compulsion of a contract obligation to make distribution of all "surplus accruing from all sources" according to the terms of the contract. The concluding portion of paragraph 2 of said contract states that "the several parties hereto hereby agreeing to the payment of dividends in that proportion or (of) their stock." Paragraph 3 of the contract provides that each of the parties thereto shall hold its stock in the refrigerator company subject to all the provisions of the contract, and that, in case of assignment of any shares of said stock, such transfer shall be subject to all the provisions of the contract, and that the certificates of stock shall contain full reference to the agreement. This contract is entered into between the refrigerator company and the owners of all of its stock, and it is a contract likewise between the owners of all the stock of the refrigerator company defining their respective rights in all the

earnings of the refrigerator company, and it provides in express and clear terms how distribution of surplus earnings shall be made. It makes such appropriation of the surplus fund to be thereafter created as to confer a present right upon the signatory railroad companies, even though the right cannot be exercised until the fund arises.

[9] All the parties, therefore, having a right to a specific fund to come into the hands of one of them, to assist in the creation of which each has contributed money or property, agree by written contract as to their respective interests in, and ownership of, said fund; said written contract making a specific appropriation and distribution of the entire fund. The language of the contract, we are satisfied, is sufficient to effect an equitable assignment to the railroad companies, parties thereto, and their successors, of the surplus funds in proportions as therein provided, and to create in their favor an equitable lien thereon. This lien of course is inferior to the rights of the holders of the equipment trust notes or the rights of other creditors of the appellee refrigerator company.

In Pinch v. Anthony et al., 8 Allen (Mass.) 536, 539, the court said: "The rule is perfectly well settled that a party may by express agreement create a charge or claim in the nature of a lien on real as well as personal estate of which he is the owner or possessor, and that equity will establish and enforce such charge or claim."

Story's Equity Jurisprudence, vol. 3, § 1393, shows the extent to which courts of equity will go to work out substantial justice by enforcing equitable liens and assignments, viz.: "But courts of equity will support assignments, not only of choses in action and of contingent interests and expectancies, but also of things which have no present actual or potential existence, but rest in mere possibility; not indeed as a present positive transfer operative in presenti, for that can only be of a thing in esse, but as a present contract—to take effect and attach as soon as the thing comes in esse."

We quote from section 1637, Story's Equity Jurisprudence, as follows: "Indeed there is generally no difficulty in equity in establishing a lien, not only on real estate; but on personal property, or on money in the hands of a third person, wherever that is a matter of agreement at least against the party himself, and third persons who are volunteers or have notice. For it is a general principle in equity that, as against the party himself, and any claiming under him

voluntarily or with notice, such an agreement raises a trust."

See, also, Wooster v. Trowbridge et al. (C. C.) 115 F. 722, affirmed in 120 F. 667, 57 C. C. A. 129; Terre Haute & I. R. Co. et al. v. Cox et al., 102 F. 825, 42 C. C. A. 654; Welden Nat. Bank of St. Albans v. Smith et al., 86 F. 398, 30 C. C. A. 133; Fairbanks v. Sargent, 117 N. Y. 320, 22 N. E. 1039, 6 L. R. A. 475; Walker v. Brown, 165 U. S. 654, 17 S. Ct. 453, 41 L. Ed. 865; Ingersoll v. Coram, 211 U. S. 335, 29 S. Ct. 92, 53 L. Ed. 208; United States of America et al. v. Butterworth-Judson Corporation et al., 45 S. Ct. 338, 69 L. Ed. 672, opinion filed March 2, 1925.

As this surplus fund has been invested by the refrigerator company and its predecessor in refrigerator cars and other properties, it must follow that the said railroad companies, parties to the contracts of January 1, 1894, and their successors in interest, have an equitable interest therein. We find ourselves on this subject in accord with the opinion of a former vice president and general solicitor of the Missouri Pacific Company, Mr. Martin L. Clardy, expressed in a letter of November 20, 1911, from him, to the president of the Missouri Pacific and the St. Louis, Iron Mountain & Southern Railway Companies, and the president of the Wabash Railroad Company, printed in the brief of appellant, though not appearing in the record, as follows: "I am, therefore, of the opinion that the railway companies are equitably entitled to an interest in the cars, bought with the surplus earnings of the refrigerator company, according to their respective interest in the surplus earnings which were devoted to the purchase of such cars."

[10] We are satisfied that the use of these surplus earnings in purchasing cars and other property created a trust as to such property in favor of appellant and appellee Missouri Pacific Railroad Company, and imposed upon the appellee refrigerator company, or its predecessor, the duties of a trustee in respect thereto, viz. to hold and use the same for the joint benefit of the said railroad companies.

III. Whether there was any surplus to distribute, as provided in the stockholders' contract of January 1, 1894, depends upon the construction to be given the terms used therein, "whatever surplus accruing from all sources" and "its rentals upon leased cars." If the first expression does not include earnings of the refrigerator companies from all business done, and if the second expression covers the refrigerator cars purchased under the car trust agreements, then it is probable there has been no surplus for distribution, and, as contended by appellees, no violation of the stockholders' contract of January 1, 1894.

Do the words "whatever surplus accruing from all sources," as used in the stockholders' contract of January 1, 1894, include revenue derived from business on foreign lines? It is apparent that there was a broadening and extending of the business of the refrigerator company about the time this contract was entered into. Under the contracts of 1881 the business of the refrigerator companies was confined to the lines of the railroad companies, parties to said contracts. The stockholders' contract of January 1, 1894, was to provide for a changed situation by virtue of the extension of the refrigerator company's business to other lines of railroad. While there is similarity in the two stockholders' contracts, there are important differences. The words "whatever surplus" are not found in the original stockholders' contract of 1881. The language used in that contract, and the construction thereof by all parties thereto, throws light upon the intention of the parties, and assists in the construction of the contract of January 1, 1894. The stockholders' contract of 1881 contains these provisions:

"The proceeds or earnings from the business of said first party shall be distributed in the manner following, to wit:

"(1) There shall be first paid from such earnings all the operating and other necessary expenses of said first party, of every kind whatsoever, including with said expenses, its rentals upon leased cars.

"(2) Whatever sum shall remain after the payment of the expenses and rentals above mentioned shall be distributed among the three parties hereto of the second part in the proportion which the business done and money earned over the roads or lines of each party shall bear to the whole earnings of said first party during the period for which such distribution is made, the several parties hereto hereby agreeing to the payment of dividends in that proportion (or) their stock."

Under this contract the entire sum remaining after payment of expenses, including rentals of cars, was distributed for years without question among the parties of the second part in the proportions there fixed. The distribution was not of a part of such earnings, but all of them.

On July 1, 1893, when there were accumulated surplus earnings of the refrigerator company amounting to $503,790.46 to be distributed among the signatory railroad companies, or their successors in interest, all the parties construed the language of the contract according to its plain and ordinary meaning, and made distribution of stock as a substitute for earnings in accordance with the proportions fixed in said original stockholders' contract for the distribution of net earnings, thereby increasing the number of shares held by the predecessors in interest of the appellee railroad company, and decreasing the number of shares held by the predecessor in interest of appellant. This transaction would seem to demonstrate rather conclusively that the railroad companies on the 1st day of January, 1893, placed on the original stockholders' contract the identical construction now contended for by appellant as to the contract of 1894.

January 1, 1894, when the new stockholders' contract was executed, the predecessors in interest of appellee railroad company held 75.657 per cent. of the stock of the refrigerator company. It is fair to presume that the changes made in the language of the new stockholders' contract were the result of suggestions of the predecessors in interest of appellee railroad company, they then dominating the policies of the refrigerator company, and with the evident purpose of insuring to them in the future the advantage in the distribution of the surplus earnings of the refrigerator company that would result from their large interests, provided the interpretation which had been given by all parties to the language of the original stockholders' contract was confirmed by the new contract. This apparently was made certain by the addition of the words "surplus accruing from all sources" and the use of the words "the whole surplus."

The parties themselves seem to have had no difficulty in construing the original stockholders' contract and the stockholders' contract of January 1, 1894, up to the time the contributions of the Wabash Railway Company and its predecessor to the earnings commenced to exceed those of the appellee railroad company and its predecessors in interest.

[11] The amended bill states that, since January 1, 1894, the surplus revenues of the two refrigerator companies, except as applied to the payment of cars and other properties, have been distributed and paid over to the three railroad companies or their successors in the proportions that the contributions by each of said railroad companies to the gross revenues of the refrigerator companies bore to the total amount of the surplus revenues then to be distributed. The construction given a contract by both parties through a long term of years is persuasive in arriving at the intention and purpose of the contracting parties.

[12] We reach the conclusion that the provision of the stockholders' contract of January 1, 1894, with reference to the distribution of surplus from all sources, was intended to include the earnings from foreign lines and any other outside sources, in addition to revenues derived from the business done over the lines of the railroad companies, signatories to the contract. If the expression, "surplus accruing from all sources," was not so intended, it would have been easy and natural to have so stated in the contract. It seems to us the expression used, in view of all the surrounding circumstances, is susceptible of no other construction.

The second proposition bearing on the question of "surplus" arises from the contention of appellees that the words "rentals upon leased cars," as used in paragraph 1 of the stockholders' contract of January 1, 1894, cover payments on refrigerator cars acquired under the so-called car trust agreements, and appellees contend, without contradiction so far as the record shows, that, if such payments are included in "expenses," there has been no undistributed surplus.

From the amended bill of complaint we gather that approximately 2,000 refrigerator cars were purchased outright at various times out of the surplus revenues of the refrigerator companies, and some 3,500 other refrigerator cars were purchased under what is commonly known as "car trust agreements," which provide for the execution and delivery by the refrigerator companies to the trustee named therein of interest-bearing equipment trust notes covering the installments of the unpaid purchase price of the cars; the legal title of the same remaining in the vendor until these installments of purchase price are fully paid, such payments being made from the surplus revenues of the refrigerator companies. In these agreements the deferred installments of the purchase price are designated "rentals," and the term "lease" is used. It is now contended by appellees that these so-called "rentals" are the rentals referred to in said stockholders' contract of January 1, 1894, and must be deducted from the earn-

ings in determining whether a surplus exists.

Whatever these trust agreements may be called, they are in fact conditional sale agreements for the purpose of permitting purchases of cars on time payments; the title remaining in the vendor until the purchase price is paid, then passing to the vendee. If these contracts constitute leases, and if the amounts paid were the ordinary rentals, then the peculiar and anomalous situation would be presented of a lessee, after paying his rentals as provided by the lease, becoming thereby the owner of the property.

The essential nature of the transaction cannot be changed by misbranding it or labeling it something it is not, and a conditional contract cannot be turned into a contract of lease by designating the payments thereunder "rentals."

Speaking of these car trust agreements, Jones on Corporate Bonds and Mortgages (2d Ed.) § 129, says: "Rolling stock contracts differ in form and legal effect. In legal effect they are generally conditional sales. The form may be that of a lease; but if the real character of the contract was not a bailment but a sale, and the 'rent' reserved was really installments of purchase money, the title remaining in the 'lessor' until such installments should be paid, the courts, looking at the real character of the contracts rather than the form, will hold them to be conditional sales." Further this author states (section 130): "The nature and effect of a car trust contract is to be determined by the intention of the parties, as gathered from the whole instrument, the situation of the subject-matter of the contract, and the circumstances surrounding the transaction, and not merely from the name the parties give to it. Thus, where a manufacturer of cars contracted to loan certain cars to a railroad company for hire at a stipulated price payable in installments, for which the company executed its notes, on the payment of which the car company was to relinquish the cars to the company, and on default in the payment of the notes the car company might at its option retake the cars and sell them, retaining for its own use all payments received up to that time, keeping the amount unpaid out of the proceeds and returning the surplus, if any, to the railroad company, it was held that the transaction was neither a loan nor a conditional sale of the cars, but a hypothecation of them to secure the price of them."

In Heryford v. Davis, 102 U. S. 235, 243 (26 L. Ed. 160), the facts were similar to those in this case. Mr. Justice Strong, in speaking for the court, said: "What, then, is the true construction of the contract? The answer to this question is not to be found in any name which the parties may have given to the instrument, and not alone in any particular provisions it contains, disconnected from all others, but in the ruling intention of the parties, gathered from all the language they have used. It is the legal effect of the whole which is to be sought for. The form of the instrument is of little account. Though the contract industriously and repeatedly spoke of loaning the cars to the railroad company for hire, for four months, and delivering them for use for hire, it is manifest that no mere bailment for hire was intended."

In Straus v. Victor Talking Machine Co., 243 U. S. 490, 498, 37 S. Ct. 412, 414 (61 L. Ed. 866, L. R. A. 1917E, 1196, Ann. Cas. 1918A, 955), the court said: "If we look through the words and forms, with which the plaintiff has most elaborately enveloped its purpose, to the substance and realities of the transaction contemplated, we shall discover several notable and significant features."

In Stern v. Drew, 52 App. D. C. 191, 193, 285 F. 925, 927, the court, having under consideration the construction of the language of a very similar contract to that found in the contracts under which it is alleged the refrigerator companies acquired the refrigerator cars mentioned in the amended bill, said: "This case turns upon the question of whether or not the instrument is a lease or a contract of conditional sale. The contract in terms lacks convincing proof of an intention to establish a mere bailment for hire. In construing contracts of this sort, the court will pay little regard to the name used to designate it, but will be guided rather by the real intention of the parties, as disclosed by the terms of the instrument itself."

See, also, Frank v. Denver & R. G. Ry. Co. (C. C.) 23 F. 123; Central Trust Co. v. Ohio Cent. R. Co. et al. (C. C.) 36 F. 520; Hervey et al. v. Rhode Island Locomotive Works, 93 U. S. 664, 23 L. Ed. 1003.

[13] We are of the opinion, and so hold, that the words of the contract of January 1, 1894, "rentals upon leased cars," do not include installments of purchase price of cars purchased on conditional sales contracts commonly known as "car trust agreements," and evidenced by interest-bearing equipment trust notes.

The appellee refrigerator company, under the domination and control of appellee Missouri Pacific Railroad Company and its predecessors, charged with the duty of a trustee in respect to the refrigerator cars and other property bought with the surplus earnings referred to and defined in the contract of January 1, 1894, has, according to the amended bill of complaint, refused to recognize and continues to refuse to recognize any claim of appellant to any equitable interest in said refrigerator cars and other property. It claims to hold title to the same absolutely and not as a trustee, and threatens to mortgage or dispose thereof, regardless of any claimed equitable rights of appellant. It has also attempted to arbitrarily cancel the stockholders' contract of January 1, 1894. The trustee therefore stands in the position of repudiating and refusing to recognize or to perform its duty as a trustee.

The cancellation of the stockholders' contract of January 1, 1894, would change the status of appellant and appellee railroad company to the detriment of the former. Since January 1, 1894, appellant and its predecessor have contributed larger portions to the surplus earnings of the refrigerator companies than theretofore. Prior to and at the time this action was commenced its interest in these earnings, if the contract referred to is to govern, would be approximately 55 per cent. thereof, while, if the earnings were divided as in the ordinary corporation according to stock ownership it would receive approximately 25 per cent. A cancellation of the contract would reduce appellant's beneficiary interest in the surplus earnings of the refrigerator company over one-half. Such cancellation also would wipe out the provision in paragraph 3 of the contract as to the parties holding stock subject to the provisions of the contract, and would destroy rights, the protection of which is appellant's object in this suit.

There was a provision in the operating contract of January 1, 1894, under which it could be terminated upon 60 days' notice, but no such provision appears in the stockholders' contract. There was no power, so far as the facts of this record show, in the refrigerator company, to cancel said contract. It was a solemn, binding agreement to which the refrigerator company was a party. It could not be wiped out by the mere arbitrary whim of said company. Nor do we see that the cancellation of the operating contract of January 1, 1894, would

of necessity operate as a cancellation of the stockholders' contract of even date.

[14] We are satisfied that appellant was not compelled to await action until the expiration of the corporate charter of the refrigerator company. The attempt to wipe out by arbitrary action the stockholders' contract of January 1, 1894, the threat to mortgage or sell the refrigerator cars and other property bought with surplus earnings, the repudiation by the refrigerator company of its duties as trustee, were, we think, of sufficient "hurt" to appellant to justify some exclamation of pain and warrant equitable interference to protect appellant's rights and to compel the trustee to perform its duties according to the status created by the terms of the stockholders' contract of January 1, 1894.

IV. In view of our conclusions on the main issues of the case, the question raised as to the arbitration may become moot. However, in view of a possible trial of the case on the merits, we refer briefly thereto. In November, 1911, the appellee refrigerator company, the Missouri Pacific Railway Company, the St. Louis, Iron Mountain & Southern Railway Company, and the Wabash Railroad Company, by their respective presidents, agreed to submit certain questions involved in the controversy which had arisen to Lawrence Greer, Esq., as arbitrator.

From the amended bill of complaint it appears that, in pursuance of the agreement, the contracts and papers relating to said controversy "were submitted to said arbitrator, together with a statement of the respective claims and contentions of the parties to said controversy by their respective officers and counsel, with the understanding and agreement that all parties would accept and abide by the facts and decision of said arbitrator."

The questions submitted to him for consideration and determination were:

"(1) Are the cars of the refrigerator company, which have been purchased out of its surplus earnings, which otherwise would have been distributable by way of dividends to its stockholders, still to be considered as having the character of surplus rather than capital?

"(2) If the foregoing question is answered in the affirmative, what is the proper method of apportionment of the interests of the stockholders of the refrigerator company in the cars in question?"

The holding as to the first question was as follows:

"It is understood that all parties to the present controversy agree as to the proper determination of the first question above stated, and, inasmuch as I concur in their views, the answer to such question may, for present purposes, be stated as follows: The cars purchased by application of surplus earnings of the refrigerator company may still be considered as having the character of surplus, and each stockholding railroad company is equitably entitled to an interest in the cars purchased by use of the surplus earnings of the refrigerator company."

As to the second question, his conclusion is thus expressed:

"The stockholding railroad companies are entitled to interests in the cars of the refrigerator company purchased by it out of surplus revenues, which otherwise might have been distributed in payment of dividends, upon the same basis and in the same proportion as are provided in paragraph second of the contract of 1894 with respect to the distribution of surplus of the refrigerator company, and irrespective of whether such surplus was derived from business done over the lines of the stockholding railroad companies or of other railroad companies."

It is concededly not a statutory arbitration, but is urged as a common-law one.

[15-17] Arbitration is favored by the courts. It is a mode of settling disputes less expensive and more expeditious than court procedure. In these days of long drawn out litigation and ever-increasing expense of trial, it may well become a special favorite of the law. Here were serious questions productive of litigation. The parties entered into an agreement that they should be considered and determined by an eminent and learned lawyer. He did so, and rendered his decision. The submission of the matter carried with it an implied agreement to be bound thereby. There is no claim made that the decision of the arbitrator was the result of fraud, partiality, misfeasance, or palpable mistake, resulting in an injustice to either party, or that the arbitrator went beyond the scope of the questions submitted. If the statements of fact of the amended bill are to prevail, we see no reason why the parties to the arbitration are not bound as to the questions submitted to and determined by the arbitrator, and precluded from again agitating them. 2 Ruling Case Law, § 32, p. 386; Barnard v. Lancashire Ins. Co., 101 F. 36, 41 C. C. A. 170; Burchell v. Marsh et al., 17 How. 344, 15 L. Ed. 96; City of Omaha v. Omaha Water

Co., 218 U. S. 180, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084; Toledo S. S. Co. v. Zenith Transp. Co., 184 F. 391, 106 C. C. A. 501; McNees v. Ins. Co., 69 Mo. App. 232; Chippewa Lumber Co. v. Phenix Ins. Co., 80 Mich. 116, 44 N. W. 1055; Morse on Arbitration and Award, p. 293. See, also, extended note to Williams et al. v. Branning Manufacturing Co., 47 L. R. A. (N. S.) 337, where a mass of authorities is collected on the general subject.

[18] Every reasonable intendment is indulged in favor of such an award. Reedy v. Scott, 90 U. S. 352, 23 L. Ed. 109; Grant v. National Bank of Auburn (D. C.) 232 F. 201; Aetna Ins. Co. v. Hefferlin, 260 F. 695, 171 C. C. A. 433. Such arbitrations are recognized by the laws of Missouri, the state where the agreement to arbitrate was made. Ellison v. Weathers, 78 Mo. 115; Murphy v. Northern British & Mercantile Ins. Co., 61 Mo. App. 323.

There is a clear distinction between enforcing an agreement to arbitrate that may deprive a court of its jurisdiction, and enforcing an award of an arbitrator selected and agreed upon by the respective parties. N. P. Sloan Co. v. Standard Chemical & Oil Co., 256 F. 451, 167 C. C. A. 579.

Appellees refuse to recognize or abide by the conclusions of the arbitrator, and urge that the same cannot be specifically enforced against the new Missouri Pacific Company; that it binds only the parties to the submission, and not strangers thereto; that the contract of arbitration was not binding on the receiver of the old or of the new Wabash Company; and that, in any event, the doctrine of laches prevents the enforcement thereof. Much is said in argument as to why the award should not be enforced. Letters not in evidence are used in the brief of appellees to show why the award was not carried out. We cannot agree with the contention that the amended bill of complaint fails to plead the essential requirements necessary for a court of equity to act on and enforce a common-law arbitration, nor that it discloses such laches as estops the complainant from just relief in equity.

[19] V. Appellees claim in argument that the issues arising here were determined in the case of Wabash Company and its Receivers v. Central Trust Company of New York, in the District Court of the United States for the Eastern Division of the Eastern District of Missouri in equity case No. 4350, and that such matters are now res adjudicata. Appellant denies that these questions were involved. The record in that

suit is not before us. We find nothing in the amended bill of complaint bearing on the subject. This court will not pass on questions suggested only in the briefs not in any way based on the record. If the decision in that suit is in the opinion of counsel for appellees res adjudicata as to the issues now presented, it will undoubtedly be availed of as a defense to complainant's amended bill.

We are satisfied the amended bill of complaint states sufficient facts to give appellant a standing in a court of equity and to require an answer on the part of appellees. Its dismissal upon motion was error.

The case is therefore reversed and remanded, with directions to permit appellees to answer the amended bill of complaint, in default of which a decree should be entered for appellant substantially as prayed.